**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
101 Park Avenue
New York, NY 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
Steven J. Reisman
Cindi M. Giglio
Bryan M. Kotliar

*Proposed Counsel to the Debtors*
  *and Debtors-in-Possession*

**COLE, SCHOTZ, MEISEL,**
  **FORMAN & LEONARD P.A.**
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
Facsimile: (201) 489-1536
Michael D. Sirota
Ilana Volkov

*Proposed Co-Counsel to the Debtors*
  *and Debtors-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| In re: | Chapter 11 |
| ASHLEY STEWART HOLDINGS, INC., <u>et al.</u>,[1] | Case No. 14-14383 |
| Debtors. | (Joint Administration Requested) |

## <u>DECLARATION OF MICHAEL A. ABATE IN SUPPORT OF FIRST DAY PLEADINGS</u>

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Ashley Stewart Holdings, Inc. (6790); New Ashley Stewart, Inc. (6655); AS IP Holdings, Inc. (6890); and NAS Gift LLC (5413). The Debtors' corporate offices are located at 100 Metro Way, Secaucus, NJ 07094.

I, Michael A. Abate, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am over the age of 18 and am competent to testify.  I am the Senior Vice President Finance/Treasurer and Secretary of each of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or "Ashley Stewart").  Thus, I am generally familiar with the Debtors' day-to-day operations, business affairs, financial condition, and books and records.

2.      On the date hereof (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Court").

3.      To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 Cases, the Debtors intend to request various types of typical relief in certain "first day" applications and motions (collectively, the "First Day Pleadings").  The First Day Pleadings seek relief, among other things, to:  (a) continue the Debtors' normal day-to-day operations while operating in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies, including customers, suppliers, employees and creditors; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.  Gaining and maintaining the support of the Debtors' employees and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be crucial to the success of the Debtors' efforts in these Chapter 11 Cases -- which is to engage in a going concern transaction of substantially of the Debtors' assets after a spirited marketing and court-approved auction process.

4.      I submit this Declaration in support of the First Day Pleadings.  Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of the Debtors' operations, business affairs, and financial condition and books and records.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.    General Background

### A.    Overview of the Debtors' Business

5.      The Debtors are a leading specialty retailer and brand of fashion-forward, inspirational apparel and accessories catering to plus-sized women.

6.      The Ashley Stewart concept was founded in 1991 and has grown to become a globally-recognized brand in women's fashion.  The Ashley Stewart name is synonymous with offering women who wear sizes 12 and up well-made fashionable clothes at affordable prices.  As of the Petition Date, Ashley Stewart operates 168 stores in 24 states, Washington D.C. and the United States Virgin Islands, with approximately 1,750 employees.  Ashley Stewart is headquartered in Secaucus, New Jersey.  Additionally, the Debtors have a strong digital presence through their e-commerce site, www.ashleystewart.com and their social media platforms.  The Debtors also distribute products through www.amazon.com.

7.      Ashley Stewart Holdings, Inc. ("Holdings") was formed in 2010 following the purchase of substantially all of the assets of Urban Brands, Inc. during its chapter 11 cases in the District of Delaware by a going concern purchaser that is the current equity owner of Holdings.  It is the objective of the Debtors and their constituencies to engage in a going concern sale transaction of substantially all of the Debtors' assets to maximize the recovery for creditors

and to ensure the continued employment of the foundation of Ashley Stewart's business – it's employees.

8.      The Ashley Stewart shopper has been positively responding to the improved quality of merchandise offered, the renewed emphasis on customer service and the ability to purchase a complete wardrobe in a fashion forward style. The plus size market is poised for increased growth and the Ashley Stewart shopper is in the prized 25-55 age demographic, when women are at the height of their earning power.  Customer engagement on all social media platforms has grown at a rapid pace, evidenced by repeat sales in all 50 states and 200 international markets covered by digital business.  Through digital commerce, the company is accessing markets that were previously inaccessible.

9.      In 2012, Ashley Stewart's revenue and profitability declined precipitously due to several factors including complications stemming from Hurricane Sandy and still struggling national economy.  Ashley Stewart engaged in several proactive measures in an attempt to overcome the situation, such as successfully negotiating an infusion of $5 million of senior secured subordinated debt from its majority stakeholder.  However, despite management's best efforts, Ashley Stewart, similar to many retail businesses, continued to suffer from tight liquidity.  To combat this, Ashley Stewart hired a restructuring advisor and implemented over $3 million in cost-cutting initiatives in July 2012.

10.      In early 2013, Ashley Stewart hired Duff & Phelps LLP as its investment banking firm to advise on strategic options, including raising new capital or an outright sale to a third-party.  In this process, Ashley Stewart approached a selected group of potential strategic acquirers with the opportunity to invest in, or to acquire, Ashley Stewart or its businesses.  Ten (10) potential strategic acquirers entered into non-disclosure agreements with Ashley Stewart

17585522

and were provided with due diligence materials relating to Ashley Stewart and its businesses. Additionally, Ashley Stewart explored refinancing options as an alternative to a strategic transaction and entered into non-disclosure agreements with five (5) potential lenders. Of the bids submitted, none of the potential acquirers submitted bids that were adequate in the opinion of the Board of Directors of Holdings. Therefore, Ashley Stewart focused its efforts on new financing opportunities and, in July 2013, successfully completed a refinancing of its senior secured revolving loan facility. While the refinancing increased available liquidity by approximately $8 million, disappointing financial results forced Ashley Stewart to access the additional availability provided under the new senior secured revolving loan facility with Salus (as defined below).

11.    In Summer 2013, Ashley Stewart continued its efforts to improve liquidity by instituting various changes in operational and merchandising leadership. To this end, in August 2013, Ashley Stewart appointed former non-executive Chairman of the Board of Directors of Holdings, James Rhee, to serve in the dual capacity as new Interim President and Interim Chief Financial Officer.[1] A newly configured senior management team brought a culture change by uniting the corporate and field teams behind a revised business plan and other strategic initiatives focusing on digital and e-commerce driven growth, tighter inventory management, streamlining operations and margin enhancing pricing strategies.

12.    Almost immediately, in September and October 2013, the new strategy and collective efforts of the senior management team bore fruit and Ashley Stewart experienced dramatically positive comparable store sales growth, which provided enough of a liquidity boost to fund purchases for the 2013 holiday season. These improvements were capped off with a record-breaking "Black Friday" long weekend (inclusive of "Cyber Monday"), during which

---

[1] Mr. Rhee was formerly an employee of the management company of the 1903 Equity Fund L.P.

time the Company registered sales growth of over 30% year over year.  The Company also successfully implemented a new state-of-the-art e-commerce platform just in time for the 2013 holiday season.  With these successes, the Company was able to recruit additional talent into the business.  Further, the Company was able to author a Spring 2014 inventory and real estate plan that better balanced capital spent with margin dollars.

13.    However, despite the successful internal restructuring efforts and continued strong growth in online sales, extreme adverse winter weather conditions and a weak brick and mortar shopping environment in December 2013 and January 2014 resulted in reduced store traffic and created further strains on the Company's already challenged liquidity.  The emergence and modernization of Ashley Stewart's online presence has seen dramatic growth and new customers from over 200 countries now use the web to shop Ashley Stewart.  The Company's commitment to streamline costs included closing twelve (12) stores during this period and eliminating additional positions in the field and the corporate office.  In the end, despite best efforts, prior liquidity restraints and the challenge of the severe winter weather proved too great and the Company filed for bankruptcy protection in order to best maximize value to its constituencies, protect its loyal customer base, and preserve the jobs of Ashley Stewart's trusted employees.

### B.    *The Debtors' Capital and Debt Structure*

(a)    Prepetition Senior Credit Documents

14.    As of the Petition Date, the Debtors have outstanding senior secured debt owed to Salus Capital Partners, LLC ("Salus" or the "Prepetition Senior Lender"), under an asset-based loan and letter of credit facility (the "ABL Facility") with a maximum availability equal to the lesser of $20 million and the applicable borrowing base.  As of the Petition Date, approximately $15,913,625.66 remains outstanding under the ABL Facility (together with any

amounts incurred or accrued, but unpaid prior to the Petition Date, the "Prepetition Senior Obligations"). To secure the Prepetition Senior Obligations, except for certain permitted encumbrances (the "Permitted Liens"), the Debtors granted the Prepetition Senior Lender first priority security interests in and liens on substantially all of their assets (collectively, the "Prepetition Collateral").

(b)     Prepetition Secured Subordinated Credit Documents

15.     As of the Petition Date, the Debtors had two (2) outstanding tranches of secured subordinated debt (secured debt that is junior to the ABL Facility referenced above). The senior secured subordinated debt was issued in the original principal amount of $5 million pursuant to promissory notes due November 1, 2017 (the "Senior Subordinated Notes"), issued under that certain Note Purchase Agreement, dated as of October 30, 2012, among Ashley Stewart Holdings, Inc., the Noteholders named therein, and GB Credit Partners LLC, f/k/a GB Merchant Partners, LLC, as agent ("GBCP"), as amended. The obligations under the Senior Subordinated Debt are junior and subordinate to the Prepetition Senior Obligations (together with any amounts incurred or accrued, but unpaid prior to the Petition Date, the "Prepetition Senior Subordinated Obligations"). As of the Petition Date, the principal amount outstanding under the Senior Subordinated Notes, including paid-in-kind interest that has been added to the original principal amount, is $6,252,082. To secure the Prepetition Senior Subordinated Obligations, except for certain Permitted Liens, the Debtors granted GBCP, as agent for the holders of Senior Subordinated Notes, second-priority security interests in and liens on the Prepetition Collateral.

16.     As of the Petition Date, the Debtors have outstanding junior secured subordinated debt in the original principal amount of $10 million pursuant to promissory notes

due November 1, 2017 (the "Junior Subordinated Notes"), issued under that certain Note Purchase Agreement, dated as of October 29, 2010, among Ashley Stewart Holdings, Inc., the Noteholders named therein, and GBCP, as agent. The obligations under the Junior Subordinated Notes are junior and subordinate to the Prepetition Senior Obligations and to the Senior Subordinated Notes (together with any amounts incurred or accrued, but unpaid prior to the Petition Date, the "Prepetition Junior Subordinated Obligations"). As of the Petition Date, the principal amount outstanding under the Junior Subordinated Notes, including paid-in-kind interest that has capitalized and been added to the original principal amount, is approximately $11,553,107. To secure the Prepetition Junior Subordinated Obligations, except for certain Permitted Liens, the Debtors granted GBCP, as agent for the holders of Junior Subordinated Notes, third-priority security interests in and liens on the Prepetition Collateral.

17. Salus and GBCP are party to an Intercreditor and Subordination Agreement, dated as July 23, 2013, which governs the relationship and relative rights and priorities of Prepetition Senior Obligations and the Prepetition Senior Subordinated Obligations and the Prepetition Junior Subordinated Obligations.

18. GBCP (in its capacities as agents in respect of the Prepetition Senior Subordinated Obligations and as agent in respect of the Prepetition Junior Subordinated Obligations) and the Debtors are party to a Subordination Agreement, dated as of October 30, 2012, which governs the relationship and relative rights and priorities of the Prepetition Senior Subordinated Obligations and the Prepetition Junior Subordinated Obligations.

19. GBCP, as agent, as not received any payments of interest or principal from Ashley Stewart.

17585522

(c)      Prepetition Equity Owners

20.      Holdings is the direct or indirect parent company of all of the Debtors.  As of the Petition Date, approximately 99% of the stock of Holdings is owned collectively by 1903 Equity Fund, L.P. ("1903") and 1903 Co-Investor. L.P. ("Co-Investor").  1903 and Co-Investor acquired the stock of Holdings when Holdings was formed in 2010.  At such time, the equity interests in Holdings were owned approximately 82.5% by 1903 and Co-Investor, and approximately 17.5% by a group of funds managed by Trimaran Fund Management, L.L.C. ("Trimaran").  Certain members of management of the Debtors acquired an additional 1-2% of the equity of Holdings in September 2011.  Each stockholder of Holdings also holds a Junior Subordinated Note.

21.      In December 2013, in connection with the wind-down of the Trimaran funds, Holdings purchased all of the stock and notes of Holdings then-owned by the Trimaran funds for an aggregate purchase price of $50,000.  The purchased stock was held by Holdings as treasury shares and the purchased notes were retired.  The principal amount of the retired notes was in excess of $2.9 million.  Holdings received the consent of Salus to enter into and consummate this transaction.

22.      Pursuant to the Stockholders' Agreement among the stockholders of Holdings, 1903 and Co-Investor are entitled to appoint a majority of the members of the Board of Directors of Holdings.  However, as of the Petition Date, the sole 1903 representative on the Board of Directors is Matthew R. Kahn.  The remaining three members of the Board of Directors of Holdings, who are A. David Brown, Helaine Suval and Alan B. Miller, were appointed by the Board of Directors itself and are not affiliated with 1903 or Co-Investor.

17585522

23.     1903 is a collective investment vehicle established in 2006 to invest third party capital in retail consumer opportunities.  1903 is managed by its general partner GBCP, which is a wholly owned subsidiary of Gordon Brothers Group, LLC ("GBG").   1903 has approximately thirty limited partners, all of whom are third party, unaffiliated entities.   The limited partners of Co-Investor include GBG and certain of GBG's employees.

24.     As is customary with respect to portfolio companies of 1903, the Debtors were parties to a Management Services Agreement, dated as of October 29, 2010, with GBCP (the "Management Agreement").   Under the Management Agreement, GBCP was entitled to, among other things, annual management fees.  Effective as of August 26, 2013, GBCP agreed to suspend, and thus accrue, the obligation of Ashley Stewart to pay the annual management fee. No management fee has been paid since February 2013.

### C.     *Objectives of Chapter 11 Filing*

25.     The Debtors' customer base is extremely loyal and passionate about the Ashley Stewart brand, and the new management team has been successful in authoring and executing upon a fully integrated omni-channel strategy that has resulted in significant growth in the digital channels and stabilized results in the brick and mortar channel.  The Debtors are projected to be profitable in 2014, but the Debtors are undercapitalized as a result of the challenges created by miscues made by former senior management in 2012 and early 2013.  The management of Ashley Stewart recognized that in order for the Company and the Ashley Stewart brand to thrive, the business needed either an injection of capital or a new owner with the resources to recapitalize the business and thus continue the success of the recently appointed senior management team.   Accordingly, in January 2014 the Debtors began their marketing efforts to solicit interest from prospective investors and/or purchasers of the Debtors' assets as a going concern transaction.

26.     The Debtors, in conjunction with its financial advisor, sent teasers to approximately 239 potential financial and strategic investors, of which 40 signed non-disclosure agreements ("NDAs") which provided them access to a comprehensive data room.  Of the 40 parties that signed NDAs, 18 attended meetings with the Debtors' senior management team and financial advisor.  In addition, numerous follow-up conference calls and meetings were held in order to provide potential bidders sufficient knowledge to put forward a comprehensive bid for the Debtors' assets.

## II.     First Day Pleadings[2]

27.     Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Pleadings.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' Chapter 11 Cases (the "First Day Hearing"), at which the Court will hear the First Day Pleadings.

28.     Generally, the First Day Pleadings have been designed to meet the goals of:  (a) continuing the Debtors' operations in chapter 11 with as little disruption of loss of productivity as possible; (b) maintaining the confidence and support of customers, employees and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these Chapter 11 Cases.  I have reviewed each of the First Day Pleadings, including the exhibits thereto and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their assets for the benefit of all of the Debtors' economic stakeholders and key constituencies, including customers and employees.

---

[2] Capitalized terms not otherwise defined shall have the meanings ascribed to such terms in the respective First Day Pleading.

17585522

A.     *Application for Designation as Complex Chapter 11 Cases*

29.     The Debtors believe that these Chapter 11 Cases qualify under the Court's *General Order Authorizing Procedures for Complex Chapter 11 Cases*, dated November 25, 2009, D.N.J. LBR 6003-1 and Appendix B to D.N.J. 6003-1, as complex chapter 11 cases because (i) the Debtors have total liabilities of approximately $50-100 million, (ii) the Debtors have total assets of approximately $25-50 million, and (iii) there are approximately 2,200 creditors in these Chapter 11 Cases.  Based on the foregoing, the Debtors request that these Chapter 11 Cases be designated as complex chapter 11 cases.

B.     *Application for Expedited Consideration of First Day Matters*

30.     The Debtors seek expedited consideration of the First Day Pleadings to avoid the potentially disruptive impact of the commencement of the Chapter 11 Cases on the Debtors, to facilitate an orderly transition into chapter 11 and increase going concern value.

31.     Based on the foregoing, the Debtors submit that expedited consideration of the First Day Pleadings is necessary and appropriate, and is in the best interest of their estates and creditors.

C.     *Motion of Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases*

32.     The Debtors seek joint administration of the Chapter 11 Cases.  There are four debtors in total.  Holdings is the direct or indirect parent entity of the other three Debtors.

33.     I believe that given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings and orders that will arise in these cases will affect each and every Debtor.  Thus, I believe that joint administration of these Chapter 11 Cases will reduce fees and costs.

34. To the best of my knowledge, the joint administration will not adversely affect the Debtors' respective constituencies because the Debtors request only administrative, not substantive, consolidation of the estates. Moreover, I believe that parties-in-interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of these Chapter 11 Cases.

35. Based on the foregoing, the Debtors submit that joint administration of the Chapter 11 Cases is necessary and appropriate, and is in the best interest of their estates and creditors.

**D.** ***Application of Debtors for Entry of an Order Authorizing Appointment of Prime Clerk as Claims and Noticing Agent***

36. The Debtors seek authorization to employ and retain Prime Clerk LLC ("Prime Clerk") as the Debtors claims and noticing agent in connection with the Chapter 11 Cases. Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that they will have to provide notices to more than 2,000 entities. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors. By appointing a claims and noticing agent in these Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited and the office of the Clerk of the Court will be relieved of the administrative burden of processing what may be an overwhelming amount of claims.

37. Prior to selecting Prime Clerk to act as claims and noticing agent, the Debtors obtained and reviewed engagement proposals from two other court-approved claims and noticing agents to ensure election through a competitive process. Moreover, the Debtors believe, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are

-12-

competitive and reasonable given Prime Clerk's quality of services and expertise.  I believe that

Prime Clerk is well-qualified to serve in this capacity and that Prime Clerk's retention pursuant

to the Services Agreement is in the best interests of the Debtors' estates and its creditors.  After

considering the engagement proposals received by Ashley Stewart, the retention of Prime Clerk

was approved by the independent member of the Board of Directors of Holdings.

38.     Based on the foregoing, the Debtors submit that the retention of Prime

Clerk is necessary and appropriate, and is in the best interest of their estates and creditors.

**E.**     ***Motion of Debtors for Entry of an Order Extending the Time to File
(I) Schedules of Assets and Liabilities, (II) Schedules of Executory Contracts
and Unexpired Leases, (III) Schedules of Current Income and (IV) Statements
of Financial Affairs***

39.     The Debtors request that the Court extend the 14-day period within which

to file their (i) schedules of assets and liabilities, (ii) schedules of executory contracts and

unexpired leases, (iii) schedules of current income and expenditures and (iv) statements of

financial affairs (collectively, the "Schedules").

40.     To prepare the Schedules, the Debtors must compile information from

their books, records, and other sources relating to their numerous assets and contracts, as well as

over 2,200 creditors.  Assembling the necessary information within fourteen (14) days would be

a significant burden on the Debtors, and could adversely impact the Debtors' business operations

during that period and the Debtors' reorganization and sale efforts.

41.     Although the Debtors' employees are working diligently to gather the

information necessary for the preparation of the Schedules, the volume of information is

significant and resources are limited.  In view of the amount of work entailed in completing the

Schedules and the competing demands on the Debtors' employees to assist in efforts to stabilize

business operations during the initial postpetition period, the Debtors likely will not be able to properly and accurately complete the Schedules within the 14-day time period.

42.     At the present time, the Debtors anticipate they will require at least 30 additional days to complete the Schedules.  The Debtors, therefore, request that the Court extend the 14-day period for an additional thirty (30) days, to April 22, 2014.  However, the Debtors will endeavor to complete the schedules in a quicker time-frame, particularly because such information will be necessary to disclose to a going concern purchaser.

43.     Based on the foregoing, the Debtors submit that the extension of the 14-day period to complete the Schedules by thirty (30) days, to April 22, 2014, is necessary and appropriate, and is in the best interest of their estates and creditors.

F.     ***Motion of Debtors for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utilities Services***

44.     The Debtors seek interim and final orders (i) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of the Bankruptcy Code; (ii) approving the Debtors' proposed procedures whereby Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance; and (iv) determining that the Debtors are not required to provide any additional adequate assurance, beyond what is proposed by the Debtors.

45.     In the ordinary course of their businesses, the Debtors incur utility expenses for water, sewer service, electricity, natural gas, telephone service, internet service and other services. On average, the Debtors spend approximately $300,000 each month on utility costs.  As of the Petition Date, approximately $400,000 in utility costs were outstanding and of

that amount, approximately $300,000 in utility costs were past due.   Uninterrupted utility services are essential to the Debtors' ongoing operations and therefore, to the success of these Chapter 11 Cases.   Simply put, I believe that without utility services, the Debtors' operations will shut down.

46.     Based upon cash flow from operations and borrowings under the DIP Facility, the Debtors expect to have ample liquidity to timely pay all postpetition obligations owed to their Utility Providers.   Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtors will deposit $150,000 (the "Utility Deposit") into a segregated, interest-bearing account within 20 days of the Petition Date (the "Utility Deposit Account" and, together with the DIP Facility and cash flow from operations, the "Proposed Adequate Assurance").   This amount represents a sum equal to 50% of the Debtors' estimated monthly cost of utility service.   I believe that the Proposed Adequate Assurance provides adequate protection.   In addition, the Debtors have a powerful incentive to stay current on their utility obligations because of their reliance on utility services for the operation of their businesses.

47.     Notwithstanding the Proposed Adequate Assurance, if a Utility Provider is not satisfied that the establishment of the Utility Deposit Account provides adequate assurance of future payment, the Debtors have proposed procedures (the "Procedures") under which the Utility Provider may make additional requests for adequate assurance.

48.     I believe that the proposed Procedures are necessary in these Chapter 11 Cases.   If they are not approved, the Debtors could be forced to address numerous requests by their Utility Providers in a disorganized manner during the critical first weeks of the cases. Moreover, the Debtors could be blindsided by a Utility Provider unilaterally deciding on or after

17585522

the 30th day following the Petition Date that it is not adequately protected and discontinuing

service or making an exorbitant demand for payment to continue service. Discontinuation of

utility service could essentially shut down operations, and any significant disruption of

operations could put these Chapter 11 Cases in jeopardy.

49.      Based on the foregoing, the Debtors submit that the relief requested is

necessary and appropriate to avoid immediate and irreparable harm to the Debtors, and is in the

best interest of their estates and creditors.

**G.      *Motion of Debtors for Entry of an Order (I) Authorizing, But Not Directing, Payment of Certain Prepetition Taxes and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Electronic Transfers and Checks***

50.      The Debtors see authority to pay prepetition Taxes to Taxing Authorities,

including all taxes subsequently determined upon audit, or otherwise, to be owed for periods

before the Petition Date, and including any penalties or interest thereon.

51.      In the ordinary course of their business, the Debtors (i) incur and/or collect

the Taxes, which includes sales, use, income, property and other miscellaneous taxes, (ii) incur

business license and permit fees (including annual report fees) in connection with obtaining

licenses and permits necessary to operate their business, miscellaneous fees (*e.g.*, fees resulting

from inadvertent false alarms by the fire and burglar alarm systems in the Debtors' retail stores),

and other similar assessments (collectively, the "Fees"), and (iii) remit such Taxes and Fees to

the Taxing Authorities.

52.      The Debtors are current on substantially all of the Taxes and Fees that

have become due as of the Petition Date. However, because certain of the Taxes and Fees are

paid on a periodic basis (and in arrears), there is, in many instances, a delay between the time

when the Debtors incur an obligation to pay the Taxes and Fees and the date such Taxes and

Fees become due.  Various Taxing Authorities may, therefore, have claims against the Debtors

for Taxes and Fees that have accrued but remain unpaid as of the Petition Date or that will come

due during the pendency of these Chapter 11 Cases.

53.      Also in the normal course of business, the Debtors are required to collect

Sales Taxes from purchasers of their products on a per sale basis and periodically remit the Sales

Taxes to the applicable Taxing Authorities.  Typically, Sales Taxes accrue as products are sold,

and such taxes are calculated based on a statutory percentage of the sale price.  The Debtors

collect the Sales Taxes as they accrue and remit the total outstanding Sales Taxes to the

applicable Taxing Authorities on or about the twentieth (20th) day of the month following the

month for which Sales Taxes were collected.  As of the Petition Date, the Debtors do not believe

there are any amounts past and owing to the Taxing Authorities on account of the Sales Taxes.

54.      The Debtors also incur Use Taxes in the ordinary course of business.  The

Debtors' liability for Use Taxes arises from (i) purchases of fixed assets without sales tax or

(ii) purchases of supplies without Sales Tax.  Purchases without Sales Tax occur when property

or services are purchased from vendors that have no nexus to the resident state of the purchaser,

such vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state

of the vendor's operations.  Nevertheless, purchasers, such as the Debtors, are obligated to self-

assess and pay Use Taxes, when applicable, to the state in which the Debtors are the "end user"

of the goods or services provided by the vendor with no nexus to that state.  The tax rate for Use

Taxes is equal to the tax rate for Sales Taxes.  As of the Petition Date, the Debtors estimate that

approximately $800,000 in Sales Taxes and Use Taxes relating to the prepetition period will

become due and owing to the Taxing Authorities in the ordinary course of business.

55.     In addition, under applicable law, state and local governments in certain jurisdiction where the Debtors operate are granted the authority to levy taxes against the Debtors' personal property (the "Personal Property Taxes").  The Personal Property Taxes are generally paid in arrears annually in the ordinary course of the Debtors' business.  The Debtors estimate that approximately $150,000 of Personal Property Taxes have accrued based upon property owned during calendar year 2013 and will become due during the remainder of 2014.

56.     Moreover, as a result of their operations throughout the United States, the Debtors incur Income Taxes in certain U.S. states and municipalities and the Debtors make annual and quarterly estimated payments to the applicable Taxing Authorities in connection with such Income Taxes.  The Debtors also pay Franchise Taxes to certain of the Taxing Authorities, thus authorizing the Debtors to operate their businesses, while other states assess a Franchise Tax based upon some measure of income, gross receipts, net worth or other measure of value.  The Debtors estimate that they owe approximately $34,000 in such Income and Franchise Taxes to certain of the Taxing Authorities for the period prior to and including the Petition Date.  The Debtors are scheduled to make quarterly estimated payments toward Income and Franchise obligations in 2014 for taxes accruing prior to the Petition Date.

57.     Many municipal and county governments require the Debtors to obtain a business license and to pay corresponding business license fees (collectively, the "Business License Fees").  The criteria that require a company to obtain a business license and the manner in which the Business License Fees are computed vary greatly according to local tax laws.  Some jurisdictions assess Business License Fees based on a flat fee, others upon the number of employees working in the jurisdiction and others upon gross receipts.  Certain state governments also require the Debtors to pay annual report or bi-annual report taxes to be in good standing for

purposes of conducting business within that state.  The Debtors estimate that they owe approximately $54,000 in prepetition Business License Fees (inclusive of annual reports).

58.     The Sales Taxes and the Use Taxes constitute "trust fund" taxes, in which the Debtors hold only legal title and not an equitable interest.  Funds on account thereof must be held in trust by the Debtors for the benefit of the appropriate Taxing Authorities.  In addition, many federal and state statutes provide that officers and directors of collecting entities are personally liable for certain taxes owed by those entities.  To the extent that certain Taxes that remain unpaid by the Debtors, the Debtors' directors, officers, and executives may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases.  Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their officers, directors, and executives from the orderly administration of these Chapter 11 Cases, to the detriment of all parties in interest.

59.     Based on the foregoing, the Debtors submit that obtaining authority to pay the foregoing Taxes and Fees is necessary and appropriate to avoid immediate and irreparable harm to the Debtors, and is in the best interest of their estates and creditors.

**H.** ***Motion of Debtors for Entry of an Order Authorizing, But Not Directing, Payment of Certain Prepetition Common Carrier, Warehouse and Related Obligations***

60.     The Debtors seek authority to pay prepetition shipping, storage and associated fees and expenses to Common Carriers that the Debtors determine, in the exercise of their business judgment, are necessary or appropriate to obtain the release of Goods in the possession of such parties and to satisfy the liens, if any, in respect of amounts owed to such parties.

61.     In the ordinary course of their businesses, the Debtors employ the services of the Common Carriers to ship, transport, store and deliver goods from their distribution center

17585522

to stores and e-commerce customers.  The Debtors primarily use Federal Express for transporting Goods to stores from the distribution centers and to fulfill e-commerce orders.  Some of the Common Carriers have outstanding invoices for Goods delivered to the Debtors prior to the Petition Date or outstanding invoices related to the storage of such Goods prior to the Petition Date (collectively, the "Charges").  The Debtors believe that if they fail to pay these Charges, the Common Carriers may discontinue or delay services and withhold or prevent shipment and sale of essential Goods.

62.     As of the Petition Date, the Debtors believe that the approximate value, at cost, of Goods ordered and either awaiting transit or in transit to the Debtors' stores and distribution center is $28 million.  In contrast, the Debtors estimate that the total amount owing to all Common Carriers is approximately $825,000.  I believe that the Debtors' business operations and the success of the Chapter 11 Cases depend on the delivery of Goods in a timely manner.

63.     If the Debtors do not pay the prepetition charges, the Common Carriers may refuse to release or ship Goods to the Debtors, severely disrupting the Debtors' business. Without the performance of services by the Common Carriers, the Debtors face the risk of a serious interruption in the flow of inventory to their stores and deliveries to e-commerce customers.

64.     The Debtors seek to pay the prepetition Charges for several reasons.  First, if the prepetition Charges are not paid, the Common Carriers may refuse to perform additional services for the Debtors.  In such event, the Debtors will incur additional expenses (such as premium shipping costs) to replace the Common Carriers.  Second, if shipments to and from the distribution center and the stores are not made promptly and regularly, the Debtors may risk

17585522

having inadequate in-store inventory, which would frustrate the expectations of their customers and cause a loss of customer confidence.  Such an outcome could be potentially devastating to the going-concern value of the Debtors.

65.     Based on the foregoing, the Debtors believe that obtaining authority to pay the Charges to the Common Carriers is necessary to avoid immediate and irreparable harm to the Debtors' business and the Debtors believe that these payments are necessary to preserve value for the benefit of all constituencies.

**I.**     ***Motion of Debtors for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Claims of Critical Vendors***

66.     The Debtors seek authority to pay certain Critical Vendor Claims that are essential to the Debtors' business operations in an aggregate amount not to exceed $2,500,000 (the "Critical Vendor Cap"), with $700,000 being available on an interim basis (the "Interim Critical Vendor Cap").

67.     The Critical Vendors constitute a small portion of the Debtors' trade vendors.  Specifically, the Critical Vendors total 12 vendors and the prepetition trade amount owed to Critical Vendors represents approximately 15% of the Debtors' total prepetition trade obligations of approximately $17 million.  Moreover 40% of the Critical Vendor Cap would potentially be used to pay amounts which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

68.     The requested relief for authority to pay the Critical Vendor Claims is important and necessary for all of the Debtors' estates.  It is incumbent upon the Debtors to preserve the going concern value of the Debtors' assets during the time period between the Petition Date and the date on which such sale transaction is consummated.  Obtaining authority to pay the Critical Vendor Claims will enable the Debtors to preserve the value of the Debtors'

17585522

enterprises because it will enable Critical Vendors to continue providing essential goods to the Debtors postpetition which in turn will allow the Debtors to continue operating its business in the ordinary course.

69.      The Debtors believe that immediate payment of the Critical Vendor Claims is not only critical to the Debtors' efforts toward a going concern sale, but immediately necessary in light of the industry in which the Debtors operate.  The Critical Vendors generally consist of the parties that supply, either directly or as a distributor, vital merchandise, supplies and services for the Debtors' operations.  The Debtors rely on daily deliveries of inventory. Without these deliveries, the Debtors' retail and e-commerce businesses could be severely disrupted and even grind to a halt if the Debtors would be unable to provide merchandise to their customers.  I believe that given the highly competitive market in which the Debtors operate, this disadvantage would lead to an immediate erosion in customer confidence which would be difficult, if not impossible, to restore.

70.      The Critical Vendors supply certain merchandise, supplies and services that are absolutely critical to the Debtors' ability to sustain their operations.  In my business judgment, the failure to pay the Critical Vendor Claims would result in the Critical Vendors refusing to provide goods to the Debtors postpetition which could have an immediately devastating effect on the Debtors' ability to operate their businesses.  Moreover, the delay attendant to the Debtors changing from a Critical Vendor to another vendor of similar products (assuming one could be located) would likely have a similarly devastating effect on the Debtors' operations.

71.      The Debtors and their advisors have examined whether the payment of Critical Vendor Claims is necessary, will ameliorate immediate and irreparable harm to the

Debtors' business operations and will ensure that the Debtors have access to adequate trade credit postpetition.  Specifically, the Debtors have undertaken a thorough review of their accounts payable and their list of prepetition vendors to identify those vendors who are essential to the Debtors' operations.  The Debtors have further developed certain procedures (for which they seek this Court's approval) that, when implemented, will ensure that the Debtors derive value for payments to Critical Vendors such that vendors receiving payment of Critical Vendor Claims will continue to supply trade credit for the Debtors' operations on a postpetition basis.

72.     Based on the foregoing, the Debtors submit that obtaining authority to pay the Critical Vendor Claims is necessary and appropriate to avoid immediate and irreparable harm to the Debtors, and is in the best interest of their estates and creditors.

**J.**     ***Motion of Debtors for Entry of an Order Authorizing Continued Use of Existing Bank Accounts, Cash Management System and Checks and Business Forms***

73.     The Debtors request an order (a) granting a waiver, to the extent required, from the United States Trustee's operating guidelines for debtors-in-possession described below, (b) authorizing them to continue to maintain the Bank Accounts and to utilize their cash management system in effect prior to the Petition Date, with the Bank Accounts to be funded from their proposed postpetition financing, (c) authorizing them to close Accounts and to open new Bank Accounts in the ordinary course of business without having to seek Court approval or to designate such accounts as "debtor-in-possession" accounts, and (d) authorizing them to continue to utilize their existing business forms, including checks.

74.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect and disburse funds (collectively, the "Cash Management System").  I do not believe that the continuation of the Cash Management System will prejudice the rights of any party in interest, but rather will benefit all creditors by

minimizing disruptions to the Debtors' businesses and by preserving the administrative savings

which the Cash Management System currently provides.    The Cash Management System

provides a cost-effective and efficient means of managing the Debtors' finances, and

maintenance of the Cash Management System will benefit all creditors by reducing the daily

operating expenses of the Debtors' estates.    I believe that failure to continue the Cash

Management System would disrupt the Debtors' operations and impose a financial and

administrative burden on the estates to the detriment of all constituencies.

75.    As of the Petition Date, the Debtors maintained with various banks (the

"Cash Management Banks") the bank accounts (the "Bank Accounts").   The Debtors maintain

that substantially all of the Bank Accounts are in financially stable banking institutions with

FDIC or FSLIC insurance (up to an applicable limit on each account).   The principal components

of the Cash Management System are described below.

    a.   Wells Fargo Blocked Control Account: The Debtors maintain a central
blocked control account at Wells Fargo, N.A. (the "Wells Fargo Blocked
Control Account").   In the ordinary course of the Debtors' business, and as
described in greater detail in (b), (c), and (d), below, the Wells Fargo
Blocked Control Account is funded primarily with the proceeds of sales of
merchandise at the Debtors' retail locations.   The Wells Fargo Blocked
Control Account is swept daily.   Any funds in the Wells Fargo Blocked
Control Account are swept and applied against the Debtors' line of credit
with Salus. Consequently, the Wells Fargo Blocked Control Account is a
zero balance account.

    b.   Local Store Depository Accounts: Each of the Debtors' retail locations
intake receipts for the sale of merchandise either in the form of cash,
check, or via a credit or debit card transaction. On a daily basis, all
receipts in the form of cash or check are deposited into a depository
account at local banks unique to each of the Debtors' retail locations
(each, a "Local Store Depository Account" and collectively, the "Local
Store Depository Accounts").   The Local Store Depository Accounts are
swept on a daily basis and all the proceeds are transferred to the Wells
Fargo Blocked Control Account.   To the best of my knowledge there are
24 such Bank Accounts.

c. <u>Bank of America Management Services</u>: The Debtors accept Visa, MasterCard, AMEX, and Discover credit and debit cards in their stores. Bank of America Merchant Services ("<u>Bank of America Services</u>") facilitates the settlement of all of the Debtors' store- based transactions involving credit or debit cards.  Once the settlement process has been completed (2 to 4 day process), Bank of America Services remits the cash proceeds of the credit or debit card transactions to the Debtors by transferring any such funds to the Wells Fargo Blocked Control Account. The Debtors' e-commerce business accepts Visa, MasterCard, AMEX, and Discover credit and debit cards.  Litle & Co. ("<u>Litle Services</u>") facilitates the settlement of all of the Debtors' online transactions involving credit or debit cards.  Once the settlement process has been completed (4-6 day process), Litle Services remits the cash proceeds of the credit or debit card transactions to the Debtors by transferring any such funds to the Wells Fargo Blocked Control Account.

d. <u>Alliance Data Services</u>: The Debtors offer their own in-house credit card to their customers (the "Ashley Stewart House Card"), which is accepted in their stores and on-line through the Debtors' websites.  Alliance Data Services ("<u>Alliance Data</u>") administers the Ashley Stewart House Card and facilitates the settlement of all of the Debtors' transactions involving the Ashley Stewart House Card.  All risk of loss with respect extensions of credit under the Ashley Stewart House Card is borne by Alliance Data Services.  The Debtors pay Alliance Data a nominal fee for administering the Ashley Stewart House Card. Once the settlement process has been completed (3 to 5 day process), Alliance Data remits the cash proceeds of the Ashley Stewart House Card transactions to the Debtors by transferring any such funds to the Wells Fargo Blocked Control Account.

e. <u>Wells Fargo Operating Account</u>: The Debtors also maintain a central operating account at Wells Fargo, N.A. (the "<u>Wells Fargo Operating Account</u>").  On a regular basis, the Debtors will determine the cash needs of the business based on anticipated operating costs and expenses.  Based on these determinations, the Debtors will customarily make a draw request on their revolving credit facility at Salus.  Subject to availability on the revolving credit facility, Salus. will transfer the requested funds to the Wells Fargo Operating Account.  The Wells Fargo Operating Account is, in turn, linked to a series of controlled disbursement accounts designed to make disbursements for the Debtors' daily operational needs.  The Wells Fargo Operating Account is linked to the Wells Fargo Merchandise Payables Account, the Wells Fargo Payroll Account, the Wells Fargo Employee Expense Account and the Wells Fargo Expense Payables Account.

f. <u>Wells Fargo Payroll Account</u>: The Debtors maintain a bank account at Wells Fargo, N.A. to cover the Debtors' payroll disbursements to their

employees (the "<u>Wells Fargo Payroll Account</u>").  The Debtors generally process their payroll through Automatic Data Processing, Inc. ("<u>ADP</u>"), which then pays the Debtors' employees either by direct deposit or by check.  The Debtors electronically transfer funds to ADP, which in turn funds all direct deposit payroll obligations through an ADP account.  Any of the Debtors' employees that are paid by check, rather than direct deposit, receive a check printed by ADP and drawn on an ADP bank account.

g.  <u>Wells Fargo Expense Payables Account</u>: The Debtors maintain a bank account at Wells Fargo, N.A. (the "<u>Wells Fargo Expense Payables Account</u>") to cover the Debtors' disbursements relating to their operations (including, without limitation, the payment of invoices for lease payments and other operating expenses), other than those made through the Wells Fargo Payroll Account, the Wells Fargo Employee Expense Account and the Wells Fargo Merchandise Payables Account, The Wells Fargo Expense Payables Account is funded automatically on an as-needed basis from the Wells Fargo Operating Account.

h.  <u>Wells Fargo Merchandise Payables Account</u>: The Debtors maintain a bank account at Wells Fargo, N.A. (the "<u>Wells Fargo Merchandise Payables Account</u>") to cover the Debtors' disbursements relating to their invoices for trade payables.  The Wells Fargo Merchandise Payables Account is funded automatically on an as-needed basis from the Wells Fargo Operating Account.

i.  <u>Wells Fargo Employee Expense Account</u>:  The Debtors maintain a bank account at Wells Fargo, N.A. (the "<u>Wells Fargo Employee Expense Account</u>") to cover the Debtors' disbursements relating to their invoices for employee expenses.  The Wells Fargo Employee Expense Account is funded automatically on an as-needed basis from the Wells Fargo Operating Account.

76.    It is my understanding that the Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity to the Debtors.  Indeed, large, multiple-entity businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to: (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  I believe that granting the Debtors authority

to continue using the Cash Management System will help facilitate a smooth transition into and during the Chapter 11 Cases.

77.     In the ordinary course of business, the Debtors use numerous varieties of business forms.  To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession; provided, however, that the Debtors will obtain new business form stock reflecting their status as debtors-in-possession once all existing business form stock on hand is exhausted.  With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

78.     I believe that authorizing the Debtors to continue to use their existing Bank Accounts is essential to a smooth transition into Chapter 11 and to avoid disruption to the Debtors' business during their reorganization efforts.  For instance, the Debtors' employees would suffer great hardship if the Debtors were compelled to substitute a new debtor-in-possession payroll account, which could cause delays, confusion, and disruption of payments that would adversely affect employee morale.  Similar consequences could result if the Debtors had to change accounts used to pay their vendors or suppliers.

79.     Similarly, I believe that the Debtors' continued use of their existing cash management system during these Chapter 11 cases is critical.  Any disruption to the Debtors' ordinary business affairs could adversely impact their effort to maximize value and reorganize, to

17585522

the detriment of creditors and other parties-in-interest.  The Debtors will continue to maintain

strict records with respect to all transfers of cash for reporting and accounting purposes.

80.    The Debtors also request permission to continue to use their existing

business forms, including checks.  If forced to replace their existing business forms, the Debtors

would need to spend a substantial amount of time and money printing new business forms and

stationery, which would disrupt the Debtors' ordinary business affairs and interrupt the normal

payment of wages, salaries,[3] and necessary supplies.

81.    The Debtors also seek an interim and final modification of the deposit

guidelines set forth in section 345(b) of the Bankruptcy Code to permit the Debtors to maintain

their Bank Accounts.  Except for one account with a daily balance at times in excess of

$250,000, the Debtors do not expect that the amounts deposited in the Bank Accounts will

exceed the amount insured by the FDIC for any significant amount of time.  To the extent that

any amount deposited would exceed the FDIC insured amount, the Debtors' current practices

provide sufficient protection for their cash and it would be in the estates' best interests for the

Debtors to continue to follow these practices.

82.    I believe that a modification of the deposit guidelines of section 345(b) of

the Bankruptcy Code will facilitate a smooth and orderly transition into chapter 11 and minimize

disruption to the Debtors' business affairs. The deposits at issue are safe because of the strength

of the Debtors' banking institutions.  Requiring the Debtors to change their deposits and other

procedures abruptly could result in harm to the Debtors, their estates and their creditors because

it would disrupt the Debtors' cash management system.  In addition, requiring the Debtors to

---

[3]On the Petition Date, the Debtors also filed a motion seeking authority, among other things, to pay prepetition wages, salary, and other benefits that accrued prepetition.  Should the Court grant that motion but require the Debtors to replace their existing business forms, the Debtors could be forced to re-issue checks to employees or deal with interruptions to payments the Debtors deposit directly into their employees' accounts.

open multiple accounts at different banks so that the deposits in each such account would be insured by the FDIC would be unnecessarily costly and burdensome and would prevent the Debtors' limited financial staff from focusing their undivided attention on the Debtors' efforts to engage in a going concern sale of their business.

83.     Based on the foregoing, the Debtors submit that authority to (i) continue maintaining the Bank Accounts and cash management system, (ii) close Bank Accounts and open new Bank Accounts in the ordinary course of business without having to seek Court approval or to designate such accounts as "debtor-in-possession" accounts; and (iii) continue utilizing their existing business forms, including checks is necessary and appropriate, and is in the best interest of their estates and creditors.

**K.**     ***Motion of for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to Pay Prepetition Wages, Salaries and Related Obligations and Taxes; and (II) Directing All Banks to Honor Checks and Transfers for Prepetition Employee Obligations***

84.     The Debtors seek authorization to pay certain wages, salaries, benefits, taxes and other expenses related to the workforce employed in the Debtors' business and directing all banks to honor and pay (to the extent that sufficient funds are available in the Debtors' accounts) all checks and transfers for payment of prepetition employment obligations.  I believe that it is imperative that this Court permit the Debtors to continue to pay and honor all prepetition obligations to employees, and other parties for the benefit of their employees (i.e. insurance providers, payroll processors and other similar parties).

85.     I believe that any delay in paying the Employee Obligations would severely disrupt the Debtors relationship with the Employees and Independent Contractors and irreparably impair morale at the very time that their dedication, confidence, and cooperation are most critical.  The Debtors face the risk that their operations may be severely impaired if the

Debtors are not granted authority to pay all accrued but unpaid Employee Obligations.  At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay Employee Obligations in the ordinary course of business.  Failure to grant the relief requested will severely undermine the morale of the Debtors' employees.  Employee morale currently is at a very sensitive stage because of the filing of these Chapter 11 Cases and the Debtors' remaining employees are being asked to commit significant time and energy to the Debtors' going concern sale efforts.

86.    Indeed, many of the Debtors' employees are the sole source of support for their families and are dependent upon their weekly salaries, reimbursements, and benefits.  If the amounts owed to the Debtors' employees are not received, or insurance premiums are not paid in the ordinary course, the employees may suffer extreme personal hardship and, in many cases, would be unable to pay their basic living expenses, causing serious harm to their families.  This potential hardship and harm would severely disrupt the Debtors' relationships with their employees, irreparably impair their morale at the very time when their dedication, confidence, and cooperation are most critical, and seriously jeopardize the Debtors' ability to operate.  Thus, the Debtors believe that the failure to pay employee wages and benefits will cause many of their employees to seek alternative employment or leave the company.  It is crucial to maintain the goodwill of the Employees given their strong relationship with the Debtors' loyal customer base.

87.    It is also possible that certain officers and directors of the Debtors could be held personally liable for the failure to pay applicable taxes, to the extent that they are considered trust fund taxes.  Such potential claims or lawsuits would prove extremely distracting for the Debtors, for the named officers and directors whose attention to the Debtors' bankruptcy

17585522

cases is required, and for this Court, which might be asked to entertain various motions seeking injunctions with respect to potential state court actions.  It is in the best interests of the Debtors' estates and the underlying policies of the Bankruptcy Code to eliminate the possibility of such distractions.

88.     The Debtors anticipate that they will have the cash on hand to pay the salaries, reimbursements, and other benefits described herein, and hence, request that the Court authorize and direct their banks to honor all checks issued and fund transfers requested in respect of the prepetition wages, salaries, and benefits from readily available funds.

***The Debtors' Employees***

89.     The Debtors' workforce consists of both hourly and salaried employees (the "Employees").  The Debtors pay approximately 1,475 Employees on an hourly basis and pay approximately 275 Employees on a salaried basis.   Additionally, the Debtors utilize 5 Independent Contractors in the ordinary course of business.  The Independent Contractors are critical to the management and operation of the Debtors.  Of the Employees, approximately 1320 are part-time Employees and approximately 430 are full-time Employees.  None of the Debtors' Employees are covered by a collective bargaining agreement.

90.     The Debtors' full-time Employees include executives, regional directors, district managers, store managers, assistant managers, sales and support associates and home office employees.  Sales and support associates, assistant managers, store managers in California and non-executive home office employees are paid by the hour, while executives, regional vice presidents, store managers, and district managers are on salary.  The managers employed by the Debtors include store managers, assistant store managers, area managers, and district managers,

-31-

among others.   Store managers report to the district managers, who report to two regional

directors.

***Employee Obligations***

91.    <u>Payroll Administration Expenses</u>.  In the ordinary course of business, the

Debtors pay Employees bi-weekly basis (corporate and store employees on an alternating bi-

weekly basis).   The Debtors' payroll obligations generally include wages and salaries, as

applicable, as well as bonuses awarded for sales productivity and goal attainment.  ADP provides

payroll administration services for the Debtors.   **Approximately 43% of the Debtors'**

**Employees are paid by direct deposit, and approximately 57% of the Debtors' Employees**

**are paid by check**.  For Employees paid by direct deposit, the Debtors electronically transfer

funds to ADP, which, in turn, transfers the funds to Employees by direct deposit.  For Employees

paid by check, ADP generates the checks on behalf of the Debtors, which contain the Debtors'

name and are drawn on ADP's account.   On average, the Debtors have gross payroll expenses

totaling $2.7 million per month.    The Debtors estimate that, as of the Petition Date,

approximately $4,000 is owed to ADP in outstanding payroll administration expenses for the

prepetition period (the "<u>Payroll Administration Expenses</u>").

92.    <u>Unpaid Compensation</u>. Additionally, because the Debtors pay Employees

in arrears, as of the Petition Date, the Debtors estimate that approximately $1.2 million would be

due and owing to their Employees on account of accrued wages, salaries and other compensation

earned prior to the Petition Date (the "<u>Unpaid Compensation</u>").  Such amounts will come due in

the ordinary course of business; consequently, the Debtors seek authority to pay up to $1.2

million in Unpaid Compensation, the bulk of which is related to compensation for Employees of

the Debtors' stores.  The Debtors are not seeking to pay any Employee's prepetition claim for

Unpaid Compensation and other benefits described herein in excess of $12,475, except for potentially *de minimis* amounts that may be owed to the Debtors' current Interim President and Interim Chief Financial Officer.  It is my understanding that none of the Debtors' employees, except for the one employee identified above, are owed an amount in excess of $12,475, which I have been advised by my counsel is the cap for priority wage claims.

93.    <u>Deductions</u>. During each applicable pay period, certain amounts are deducted from Employees' paychecks, including, without limitation, (a) garnishments, child support and similar deductions, and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed in the motion (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions and miscellaneous deductions) (collectively, the "<u>Non-Tax Deductions</u>").  The Debtors effect these deductions in accordance with information provided by the Employees and forward the amount of the Non-Tax Deductions to the appropriate third-party recipients.  Approximately $140,000 is deducted from Employees' paychecks on a monthly basis.  However, certain of the Non-Tax Deductions comprising this $140,000 may not, as of the Petition Date, been forwarded to the appropriate party.  The Debtors are seeking authority to pay those amounts, which have been withheld.

94.    <u>Withholdings</u>. Federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state or local taxing authority (collectively, the "<u>Withheld Amounts</u>").  The Debtors must then provide additional amounts for federal and state unemployment insurance (the "<u>Employer Payroll Taxes</u>" and together with the Withheld Amounts, the "<u>Payroll Taxes</u>").  On average, the Payroll Taxes, including both the employee and

17585522

employer portions, total approximately $850,000 per month.  Prior to the Petition Date, the Debtors, through ADP, withheld the appropriate amounts from Employees' earnings for the Withheld Amounts, but such funds may not have been forwarded to the appropriate taxing authorities as of the Petition Date.

95.     Honoring Checks for, and Payment of, Reimbursable Expenses. In the ordinary course of business, the Debtors reimburse Employees for certain Reimbursable Expenses incurred in the scope of their employment and on behalf of the Debtors.  Employees incur, on average, approximately $60,000 per month in Reimbursable Expenses such as business-related travel costs (i.e. meal, hotel and rental car costs) with the understanding that they will be reimbursed.  In addition to traditional expense-based reimbursement for out-of-pocket expenses incurred by the Employees on the Debtors' behalf, approximately 35 of the Employees also have Company Credit Cards.  All of the Company Credit Cards are issued by American Express.  The Company Credit Cards are issued in the name of the eligible Employee and feature both the Employee's name as well as that of one of the Debtors on the face of the card.  Prior to receiving a Company Credit Card, any Employee to whom a Company Credit Card will be issued must sign a Company Issued American Express Credit Card Acknowledgement pursuant to which the Employee acknowledges that the Company Credit Card is exclusively for use in connection with valid businesses expenses (consistent with the Debtors' Travel and Expense Policy) and that the Employee is required to submit documented expense reimbursement reports in conjunction with any charge made on a Company Credit Card.  The Employees are personally liable for all charges made on the Company Credit Cards and enter into a card member agreement with American Express before the Company Credit Card is issued.  The Debtors are guarantors on certain of the Company Credit Cards.  The Employees

17585522

receive physical credit card statements from American Express and are responsible for making all payments to American Express. All Company Credit Card balances must be paid in full each month. Once an Employee is terminated, the Debtors take prompt action to ensure that the terminated Employee's Company Credit Card is cancelled and that the outstanding balance is paid. The Debtors estimate that, as of the Petition Date, Reimbursable Expenses in the approximate amount of $175,000 remain outstanding.

96.    Prepetition Employee Bonus Plan. In the ordinary course of business, the Debtors offer store-line performance bonus programs to management level Employees. Specifically, the Debtors offer the Store Management Incentive Bonus Plan (the "Store Management Incentive Plan"), the DSM/ASM Incentive Bonus Plan (the "Incentive Plan") and the Regional Director Incentive Bonus Plan (the "RD Incentive Plan" and collectively with the Store Management Incentive Plan and the DSM/ASM Incentive Plan, the "Employee Bonus Plans").

a.    The Store Management Incentive Plan.    Approximately 161 store managers and 453 full and part-time co-store managers (collectively, the "Managers") are eligible to participate in the Store Management Incentive Plan.    The Store Management Incentive Plan provides bonuses to Managers who are on active status and are in a management level position at the time that the bonuses are paid. The amount of the bonus depends on the achievement of the company's pre- determined sales goals for each individual store. Each store is assigned a base sales goal at the beginning of the month that, if achieved, will allow the store management team to achieve its base incentive award. Unlike the full and part-time co-store managers, however, the store managers have an opportunity to earn higher bonus amounts by achieving 3%, 6% or 10% over the base sales goal. Additionally, each associate in the store that achieves the highest percent of SMS Texts that lead to transactions for the company in a month earns a bonus. The associates must be employed at the store on the last day of the month to be eligible for payment. Additionally, the associates who meet the eligibility for payment criteria will receive 100% of the incentive award earned within thirty (30) days following the last day of the month in which the incentive was earned. Finally, each associate in the store that achieves the highest private label credit card applications as a percentage

of transactions earns a bonus. The associates must be employed at the store on the last day of the month to be eligible for payment. Additionally, the associates who meet the eligibility for payment criteria will receive 100% of the incentive award earned within thirty (30) days following the last day of the month in which the incentive was earned.

b.      The DSM/ASM Incentive Plan. Approximately 16 district sales managers (the "DSMs") and 1 area sales manager (the "ASM") are eligible to participate in the Debtors' bonus program predicated upon achieving and exceeding the Debtors' sales and payroll goals for their respective districts/areas consistent with prepetition practices. To be eligible, the DSM or ASM must be on active status and in that position at the time that the bonus is paid. Participants who become eligible to participate in the DSM and ASM Incentive Plan after the beginning of the month will be eligible for a pro-rated share of the incentive earned for the first month, as long as they are in a DSM or ASM position for a majority of that month. The DSM and ASM Incentive Plan operates similarly to the Store Management Incentive Plan such that if the DSM's or ASM's district/area achieve their base sales goal for the month, the DSM or ASM will earn 60% of their bonus and if the DSM's or ASM's district/area achieve their base sales goal for the quarter, the DSM or ASM will earn 20% of their bonus. Like the store managers, the DSMs and ASM will have an opportunity to earn higher bonuses by achieving 3% or 6% over the base sales goal. In addition, if the DSMs' or ASM's district/area is at or below their payroll goal for the quarter the DSM or ASM will earn 20% of their bonus. Additionally, the DSMs or ASMs who meet the eligibility for payment criteria will receive 100% of the incentive award earned within thirty (30) days following the last day of the month/quarter in which the incentive was earned. The DSM or ASM in the company that achieves the highest percent of email captures that lead to transactions for the company in a month earns a bonus. The DSM or ASM must be employed at the store on the last day of the month to be eligible for payment. Additionally, the associates who meet the eligibility for payment criteria will receive 100% of the incentive award earned within thirty (30) days following the last day of the month in which the incentive was earned.

c.      The RD Incentive Plan. The regional director in the company that achieves the highest percent of email captures that lead to transactions for the company in a quarter earns a bonus. The regional director must be employed with the company on the last day of the quarter to be eligible for payment. Additionally, the associates who meet the eligibility for payment criteria will receive 100% of the incentive award earned within thirty (30) days following the last day of the month in which the incentive was earned.

97.   <u>Employee Benefits</u>. The Debtors offer their Employees the opportunity to participate in the following benefit programs: domestic partner benefits, health and wellness plans, vision plans, dental plans, flexible spending account plans, life and accidental death and dismemberment plans, voluntary accident plans, short-term and long-term disability plans, voluntary legal plans, voluntary pet insurance, 401(k), employee assistance plan, travel assistance, will preparation and identity theft, discount programs, commuter benefits and personal insurance review (collectively, the "<u>Employee Benefit Programs</u>").

98.   <u>Health and Wellness Plans</u>. All full-time Employees who have completed a minimum of two months of employment are eligible to receive medical, dental, and vision benefits (collectively, the "<u>Health Plans</u>").   Under the Health Plans, the Debtors provide Employees with a medical plan administered through CIGNA.  In addition, the Debtors provide Employees with a dental plan administered through Delta.   Finally, the Debtors provide Employees with a vision plan administered through Vision Service Plan ("<u>VSP</u>").

99.   Employee contributions to the Health Plans vary depending upon the type of plan/coverage an Employee elects and the number of dependents covered by the plan.  The Debtors withhold the Employee's contribution from their earnings, contribute the balance necessary to pay for the cost associated with the Health Plans, and then periodically remit the total cost of the Health Plans to CIGNA, Delta or VSP, respectively, as the case may be. Currently, the Debtors provide medical, dental and vision benefits to approximately 310 Employees per month.  Moreover, the Debtors' Health Plans provide health care coverage to approximately 217 dependents.  The Health Plans cost the Debtors, on average, approximately $364,466 per month (approximately $92,000 of which is offset against contributions made by Employees).   The Debtors estimate that, as of the Petition Date, approximately $50,600 is

outstanding in incurred but unpaid expenses associated with administering and providing the Health Plans. Additionally, the Debtors estimate that, as of the Petition Date, approximately $250,000 is outstanding in health-related claims paid by CIGNA and to be reimbursed by the Debtors. The Debtors are self-insured with respect to the Health Plans. As such, the Debtors maintain a reserve on their balance sheet in the amount of approximately $500,000 per month for incurred but not reported claims.

100.    In addition to the Health Plans, the Debtors offer employees wellness programs (the "Wellness Programs") administered by CIGNA. Under the Wellness Programs, the participants are eligible to receive discounts, special offers and rewards for participating in programs and services designed to enhance the participants' health and wellness. The Debtors also provide Employees with a Mammogram Incentive Program.

101.    Workers' Compensation Obligations. The Debtors are required under applicable laws in the states in which they operate to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for injury claims arising from or related to their employment with the Debtors (the "Workers' Compensation Programs"). The Debtors currently ensure their workers' compensation liabilities pursuant to a policy with Zurich. The Debtors' current annual cost of providing the Workers' Compensation Programs ranges between $120,000 and $576,000 based on the claims settled each month. As of the Petition Date, the Debtors believe that they owe approximately $318,000 related to their Workers' Compensation Programs.

102.    Employee Savings and Retirement Plans. The Debtors maintain one 401(k) Plan. This plan is administered by Associated Pension/ING. The following Employees who attain six months of service and 1,000 hours as of the enrollment dates are eligible to

participate in the 401(k) Plan: all home office employees, store line managers, including full-time and part-time co-managers, and certain part-time associates hired prior to November 2002. Employees can contribute up to 20% of their compensation on a pretax basis (up to a total maximum of $17,500 per year for "non-highly compensated" Employees), subject to regulations set by the Internal Revenue Service. If the Employee is age 50 or older, he/she may contribute an additional $5,500 in "catch-up" contributions. Highly Compensated Employees (defined as those earning more than $115,000 in the prior calendar year) are restricted from contributing more than 3% of their compensation. Approximately 140 active and inactive Employees, in additional to approximately 105 former Employees, currently participate in the 401(k) Plan, and the approximate amount withheld from such Employees' paychecks for 401(k) contributions is $31,000 per month. Although the Debtors do not make any matching contributions to the 401(k) Plan, the Debtors pay Associated Pension $6,000 semi-annually for administering the 401(k) Plan (roughly $2,000 of which will be attributable to the prepetition period). The Debtors estimate that, as of the Petition Date, approximately $200 remains outstanding for administrative expenses related to the 401(k) Plan.

103.    <u>Insurance and Flexible Benefit Plans</u>. The Debtors provide each full-time Employee, who has completed a minimum of two months of employment, with group life insurance and accidental death and dismemberment coverage through CIGNA (the "<u>Life Insurance Plan</u>"). The Debtors fully fund this plan and no Employee contribution is required. Under the Life Insurance Plan, the Debtors provide eligible Employees with coverage in the amount of their base annual salary, up to a maximum of $500,000. Coverage is automatic for eligible employees and no enrollment is required. Additionally, the Debtors offer each full-time Employee, who has completed a minimum of two months of employment, the option to purchase

supplemental life insurance at the Employee's own and exclusive expense. Employees may elect to purchase supplemental life insurance coverage, at their own expense, in $10,000 increments, between $10,000 and $500,000, up to five times the respective Employee's annual salary. Employees can also elect to purchase, again at their own expense, dependent life insurance on their spouse (in units of $5,000 up to a maximum of 50% of the Employee's own supplemental life insurance coverage amount with a $50,000 maximum for dependents) or their children (in units of $5,000 for a child over 6 months of age to age 19 or 26 if a full-time student and $1,000 for a child between 2 weeks and 6 months).

104.    The Debtors also offer their Employees accidental death and dismemberment coverage (the "AD&D Coverage"). The eligibility requirements and amounts of coverage are the same as those under the Life Insurance Plan. On average, the Life Insurance Plan and the AD&D Coverage costs the Debtors approximately $5,000 per month, approximately $1,600 of which is offset against contributions made by employees. The Debtors estimate that, as of the Petition Date, approximately $21,800 is outstanding in incurred but unpaid premium expenses related to Life Insurance Plans and AD&D Coverage for the prepetition period.

105.    In addition, the Debtors offer Employees short-term and long-term disability coverage (the "LT/ST Disability Benefits"). The LT/ST Disability Benefits are administered by CIGNA. Short-term disability benefits are provided to all full-time employees who have completed a minimum of two months of employment. Coverage is automatic for eligible employees and enrollment is automatic upon eligibility. The Debtors' short-term disability coverage pays up to 60% of an eligible Employees' pre-injury earnings up to a maximum of $1,000 per week (subject to a seven (7) day wait period) for up to twenty-six (26) weeks of disability. On average, short-term disability coverage costs the Debtors approximately

$21,000 per month.  Long-term disability benefits are provided to all full- time Employees who have completed a minimum of two months of employment.  Long-term disability benefits pay eligible Employees up to 60% of their pre-injury earnings starting in the twenty-seventh week of an Employee's disability.  Eligible Employees receive a maximum benefit of $10,000 per month while disabled for a disability period that exceeds six (6) months.  Long-term disability benefits are offset by other income such as social security and workers compensation.  An employee contribution of $8.12 per bi-weekly pay period is made on an after-tax basis.  The Debtors incur approximately $2,400 per month with respect to long term disability benefits, approximately all of which is offset against contributions made by employees.

106.    Additionally, until February 2014 the Debtors used Lincoln Financial ("Lincoln") as its provider of multiple insurance policies, including life insurance, accidental death and dismemberment, and short term and long term disability.   Approximately $21,500 remains unpaid to Lincoln.

107.    Finally, the Debtors offer certain eligible Employees the ability to contribute a portion of their compensation to a voluntary accident plan, a voluntary legal plan, voluntary pet insurance and commuter benefits (the "Voluntary Benefits").  Since the Voluntary Benefits are employee funded, the Debtors currently do not pay anything toward the Voluntary Benefits other than turning over the funds withheld from the Employee's paychecks.

108.    Vacation, Sick Leave and Other Leaves of Absence.  The Debtors provide paid vacation, sick and personal time ("PTO") through their PTO plan (the "PTO Plan") to certain full-time and part-time Employees.  PTO benefits under the PTO Plan accrue based on a particular Employee's length of service and position as set forth below.

a.    Personal Days.  All full-time Employees who have completed ninety (90) days of continuous, active service are eligible for three (3) personal days

per calendar year.  Unused personal days cannot be carried over into the following calendar year and will not be paid out upon the separation from the company.

b. <u>Sick Days</u>. All full-time Employees and part-time Employees assigned to the corporate office location who have completed ninety (90) days or more of continuous, active service are entitled to four (4) sick days per calendar year.  Part-time, non-exempt Employees who have completed one year or more of continuous active service are entitled to two (2) sick days per calendar year.  As with personal days, unused sick days cannot be carried over into the following calendar year and will not be paid out upon the Employee's separation from the company.

c. <u>Vacation Time</u>. All full-time store Employees who have completed ninety (90) days of continuous, active service are entitled to vacation.  The amount of vacation time that is allocated to an Employee can only be used throughout that calendar year and is subject to "black-out" dates and business needs.  The following schedule details the amount of vacation time that a full-time eligible Employee is allocated per calendar year:

| Years of Service | Accrual/month | Non-Exempt Benefit | Exempt Benefit |
| --- | --- | --- | --- |
| 1-4 | 6.67 hours | 80 hours | 2 weeks |
| 5-14 | 10 hours | 120 hours | 3 weeks |
| 15+ | 13.34 hours | 160 hours | 4 weeks |

Part-time, non-exempt Employees hired prior to January 1, 2012 and who were eligible to receive vacation benefits as of December 31, 2011 are grandfathered in to receive vacation benefits in accordance with the following vacation and accrual schedule:

| Years of Service | Accrual/month | Benefit |
| --- | --- | --- |
| 1-4 | 2.5 hours | 30 hours |
| 5-14 | 5 hours | 60 hours |

Upon completion of 90 days of continuous, active service, full-time Employees assigned to the corporate office and senior field management are eligible to use the vacation time allotted to them in accordance with the vacation schedule indicated below.  Within their year of hire, Employees hired prior to June 30th are eligible to receive two (2) weeks of vacation benefit time.  Employees hired after June 30th are eligible to receive one (1) week of vacation benefit time.  The amount of vacation time is subject to manager approval and in consideration of "black-out" periods and business needs.

17585522

| Years of Service | Vacation Benefit | |
|---|---|---|
| 1-4 | 80 hours | 2 weeks |
| 5-14 | 120 hours | 3 weeks |
| 15+ | 180 hours | 4 weeks |

109.    Employees who have vacation time that is accrued but unused in one (1) calendar year cannot carry it over into the following year (except where required by applicable law).  Furthermore, unused vacation time cannot be paid out upon the Employee's separation from the company (except where required by applicable law).

110.    <u>Leaves of Absence</u>. The Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law (the "<u>Leaves of Absence</u>").  Leaves of Absence include family medical leave, family care leave, pregnancy disability leave, bereavement leave and military leave.

111.    The Debtors anticipate that their Employees will utilize accrued PTO and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal, ordinary course payroll obligations, and seek authority to honor such accrued benefits.

112.    <u>Additional Employee Benefits</u>. Because personal problems can have an impact on an employee's effectiveness at work, the Debtors make professional counseling services available to Employees and their dependents through an employee assistance program (the "<u>Employee Assistance Program</u>").  The program is administered by CIGNA.  Under this program, Employees and their families may visit qualified counselors and up to five (5) sessions per year with a counselor, financial planner and/or legal advisor for help with emotional and work/life concerns, such as stress, family/marital conflicts, depression, effective parenting, child care and elder care, legal issues, financial concerns, tax issues and situational life problems.  The

cost to the Debtors of the Employee Assistance Program is included in the long-term disability premium payment, and as such, the Debtors incur no stand-alone cost on account of this program.

113.    The Debtors' workforce is integral to their continued business operations. Failure by the Debtors to satisfy the Employee Obligations in the ordinary course of business from the outset of these Chapter 11 Cases will jeopardize loyalty, trust, and morale, possibly causing workers to leave the Debtors' employ and severely disrupt the Debtors' operations at a critical juncture.  Moreover, the Debtors' Employees and Independent Contractors rely on their compensation, benefits, and reimbursement of expenses to pay their living expenses, and failure to pay them in the ordinary course could be financially ruinous.  The immediate payment of employee prepetition, salaries, and related benefits is essential to prevent immediate and irreparable harm to the Debtors and their reorganization efforts and to the Debtors' employees.

114.    Accordingly, for the reasons set forth above, the Debtors respectfully submit that it is in the best interests and the best interests of their estates, creditors, and other parties-in-interest for them to pay and honor the prepetition portions of wages, salaries, and other employee benefits described above.

**L.**    ***Motion of the Debtors for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to (A) Continue Prepetition Insurance Coverage and (B) Maintain Prepetition Premium Financing Agreements; and (II) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests***

115.    The Debtors seek authorization to continue prepetition insurance coverage and maintain prepetition premium financing agreements with two parties.  The Debtors also seek an order authorizing and directing financial institutions to receive, process, honor and pay checks presented for payment and electronic payment requests related thereto.

17585522

116.    In the ordinary course of business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, workers' compensation liability, general commercial liability, property damage, umbrella liability, excess liability, business automotive liability, ocean cargo liability, and directors' and officers' liability (collectively, the "Policies").[4] Not only are some of these Policies required by various state and federal regulations, but I have been advised that section 1112 of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.

117.    The total annual premiums for the Policies in 2014 are approximately $1.4 million.  It is not always economically advantageous for the Debtors to pay the premiums on all of the Policies on a lump-sum basis.  Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the payment of insurance premiums for some of their Policies pursuant to premium financing agreements (each a  "PFA" and, collectively, the "PFAs") with third-party premium finance companies First Insurance Funding Corp. ("First Insurance") and Premium Assignment Corporation  ("Premium Assignment Corp.") (together, the "Premium

---

[4] The Debtors maintain the following insurance policies through a First Insurance Funding Corp. funding portfolio: business automobile insurance policy (policy no. BAP64783700), workers' compensation policy (policy no. WC 6478363-00), property insurance policy (policy no. MAUD3786916-8), cargo insurance policy (policy no. 0789-71-51BOS), and director and officer liability policy (policy no. 01-582-79-23).  The Debtors maintain their umbrella policies (policy nos. UMB2106604; NY12EXC734791IV; 015374932; ECO(13)55087235) pursuant to a premium financing agreement with Premium Assignment Corporation.  Additionally, the Debtors anticipate entering into an premium financing agreement to finance the premiums under their new general liability insurance policy.

The Debtors maintain the following policies directly:  (i) workers' compensation policies with (a) the New York    State Insurance Fund (policy no. z2131000-8); (b) the Ohio Bureau of Workers' Compensation (policy no. 1620597); and (c) the Virgin Islands Government Insurance Fund (policy no. 7529) (the "State Workers' Compensation Policies"); and (ii) flood insurance policies that cover certain retail stores and the Debtors' corporate headquarters    (policy    nos.    87044335802013;    87051496622013;    87051659472013;    87046151022013; 87052102462013;  87052102442013;  87052102452013;  87044335682013;  87044336062013;  87044336122013; 87044336152013; 87044572742013; 87044758842013; 87052912782013; and 87051137072013) (collectively, the "Flood Policies").  The Debtors also maintain two excise bonds of *de minimis* amounts that serve as security for their payment of utility services (policy no. 105579840) or as security for their obligation to pay excise taxes (policy no. 105449180) (together, the "Excise Bonds").

Finance Companies"). The Debtors' State Workers' Compensation Policies, Flood Policies and Excise Bonds were all paid outside of the PFAs.

118. As of the Petition Date, both through the PFA and directly to insurers, payments totaling approximately $500,000 have been made against the total annual insurance cost of approximately $1.4 million. Also as of the Petition Date, approximately $200,000 in prepetition amounts is owed in respect of the Policies. The Debtors seek authority to pay, in their reasonable business judgment, up to $200,000 in prepetition amounts owing in respect of the policies, leaving approximately $650,000 to become due postpetition.

119. Specifically, as of the Petition Date, the Debtors' business automobile insurance policy (policy no. BAP64783700), workers' compensation policy (policy no. WC 6478363-00), property insurance policy (policy no. MAUD3786916-8), cargo insurance policy (policy no. 0789-71-51BOS), and director and officer liability policy (policy no. 01-582-79-23) (the "First Insurance PFA Policies") and were paid pursuant to the PFA with First Insurance (the "First Insurance PFA"). The Debtors' umbrella policies (policy nos. UMB2106604; NY12EXC734791IV; 15374932; ECO(13)55087235) (the "Premium Assignment PFA Policies" and, together with the First Insurance PFA Policies, the "PFA Policies") were financed pursuant to the PFA with Premium Assignment Corp. (the "Premium Assignment Corp. PFA").

120. The First Insurance PFA provides financing subject to, among other things, the following terms:

| Total Premium Amount | Down Payment | Amount Financed | Finance Charge | Monthly Payment | Interest Rate | # of Payments | Initial Payment Due Date |
|---|---|---|---|---|---|---|---|
| $879,129.60 | $293,949.44 | $585,180.16 | $9,435.84 | $74,327.00 | 3.50% | 8 | 12/28/2013 |

121. The terms of the First Insurance PFA provide that the Debtors pay $293,949.44 as an initial down payment, followed by eight (8) monthly installments (bearing an

-46-

annual interest rate of 3.50%), beginning on December 28, 2013, in exchange for First Insurance's agreement to pay the annual insurance premiums to the Debtors' various insurers. Spreading out the cost of the premiums on these policies over the applicable coverage period helps the Debtors manage their cash flow.  Pursuant to the First Insurance PFA, the Debtors assigned return premiums, dividend payments, and certain loss payments to First Insurance as security.

122.    The Premium Assignment Corp. PFA provides financing subject to, among other things, the following terms:

| Total Premium Amount | Down Payment | Amount Financed | Finance Charge | Monthly Payment | Interest Rate | # of Payments | Initial Payment Due Date |
|---|---|---|---|---|---|---|---|
| $34,027.10 | $6,805.42 | $27,221.68 | $763.12 | $2,798.00 | 6.07% | 10 | 11/29/2013 |

123.    The terms of the Premium Finance Corp. PFA provide that the Debtors pay $6,805.42 as an initial down payment, followed by ten (10) monthly installments (bearing an annual interest rate of 6.07%), beginning on November 29, 2013, in exchange for Premium Finance Corp.'s agreement to pay the annual insurance premiums to the Debtors' various insurers.  As with the First Insurance PFA described above, spreading out the cost of the premiums on these policies over the applicable coverage period helps the Debtors manage their cash flow.  Similarly, pursuant to the Premium Finance Corp. PFA, the Debtors assigned return premiums, dividend payments, and certain loss payments to Premium Finance Corp. as security.

124.    It is my understanding that if the Debtors fail to pay the monthly premium obligations, the Premium Finance Companies have the right to terminate the PFA Policies and accelerate the entire unpaid premium.  Upon such termination, First Insurance has the right to set off the amount owed by the Debtors against the amount of unearned premiums returned to the Premium Finance Companies by the insurance carriers.  If the Premium Finance Companies

-47-

chose to cancel the Debtors' insurance coverage under the PFAs, the Debtors would then be forced to obtain replacement insurance on an expedited basis and at a significant cost to the estates, which would be unnecessarily disruptive.

125. In light of the importance of maintaining insurance coverage and preserving the Debtors' liquidity by financing the insurance premiums, I believe that it is in the best interests of the Debtors' estates to authorize them to honor their obligations under the PFAs.

126. In the ordinary course of business, the Debtors engaged AON Risk Services Northeast Inc. (the "Broker") to act as the consultant and insurance broker in placing their annual insurance program. The Debtors intend to continue their contacts with the Broker in the ordinary course of business.

127. The Debtors have compelling business reasons for seeking to maintain their Policies and any all necessary premiums thereunder. Insurance coverage provided under the Policies is essential for preserving the Debtors' businesses, properties, and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business. If the Debtors do not continue to perform their obligations under the Policies, their coverage thereunder could be impaired or terminated.

128. Disruption of their insurance coverage would expose the Debtors to serious risks, including: (i) the possible incurrence of direct liability for the payment of claims that otherwise would have been payable by the insurance providers under the Policies; (ii) the possible incurrence of material costs and other losses that otherwise would have been reimbursed by the insurance providers under the Policies; (iii) the possible inability to obtain similar types of insurance coverage; and (iv) the possible incurrence of higher costs for re-establishing lapsed policies or obtaining new insurance coverage. Any or all of these consequences would cause

serious and irreparable harm to the Debtors' business and restructuring efforts, as they would expose the Debtors to higher costs and increased risks of loss, at a minimum.

129.    As discussed above, pursuant to the PFAs, the Debtors assigned to the Premium Finance Companies all unearned premiums and loss payments under the PFA Policies as security for payment of all obligations of the Debtors under the PFAs.  The PFAs also grant to the Premium Finance Companies the right to cancel the PFA Policies in the event of a payment default by the Debtors.  As a result, I am advised that the Premium Finance Companies may be entitled to adequate protection of their interests in the PFA Policies.  Additionally, I am advised that the Debtors' failure to make the ongoing installment payments due under the PFAs may result in the Premium Finance Companies seeking relief from the automatic stay to terminate the PFA Policies.  If the Premium Finance Companies succeed in obtaining such relief from this Court, the Debtors would be forced to seek replacement insurance coverage and it is doubtful that they would be able to do so on terms and conditions as favorable as those presently in place under the PFAs and the PFA Policies.  In addition, given the current circumstances, there is no assurance that the Debtors would be able to obtain insurance coverage quickly enough to prevent a lapse in coverage.

130.    Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate to avoid immediate and irreparable harm to the Debtors, and is in the best interest of their estates and creditors.

**M.**    ***Motion of Debtors for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to Honor Certain Prepetition Obligations to Customers and Continue, Renew, Replace, Modify, Implement or Terminate Customer Programs in the Ordinary Course of Business; and (II) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests***

131.    The Debtors seek authorization to honor certain prepetition obligations to customers and continue, renew, replace, modify, implement or terminate customer programs in

17585522

the ordinary course of business.  The Debtors also seek an order authorizing and directing financial institutions to honor all related checks and electronic payment requests.  Essentially, the Debtors desire to continue during the postpetition period those Customer Programs that they believe are beneficial to their business and important for maintaining customer confidence and trust.  The Debtors believe that such relief is necessary to preserve goodwill with their customers for the benefit of their estates, which will assist in maximizing value for a going concern sale transaction.

132.   In the ordinary course of their business, the Debtors engage in certain marketing and sales practices that are, among other things, (i) targeted to develop and sustain positive reputations for their stores and merchandise in the marketplace, and (ii) designed to attract new customers to the Debtors' stores and to enhance store loyalty and sales among the Debtors' existing customer base.  These customer-targeted practices (collectively, the "Customer Programs") include, but are not limited to, those practices described below.

133.   To preserve the value of their business, the Debtors must promptly assure their customers that the goods and services that they have come to expect from the Debtors will continue uninterrupted and the chapter 11 filing will not interfere with the Debtors' ability to fully meet customer needs and expectations.  Continuance of the Customer Programs in the ordinary course of business and the authority to satisfy prepetition obligations relating thereto is therefore essential to the Debtors' seamless transition into chapter 11, the maintenance of customer confidence and trust, and the facilitation of the Debtors' successful chapter 11 process.

134.   The Customer Programs are integral to the Debtors' continued operations because they are necessary to maintain the confidence and goodwill of the Debtors' customer base.  The Debtors are at a critical juncture at which they must make every effort to retain

17585522

customer loyalty and confidence.  The Debtors' inability to honor the Customer Programs could materially – and perhaps fatally – impair these efforts and thwart these Chapter 11 Cases before they have a chance to begin.

135.   <u>Gift Cards</u>.  In the ordinary course of their businesses, the Debtors sell Gift Cards to customers.  These Gift Cards can be purchased in any increment and do not expire.  Gift Cards can be purchased at any of the Debtors' brick and mortar retail locations.  Gift Cards are redeemable towards the purchase price of merchandise at any of the Debtors' brick and mortar stores.  The typical redemption of Gift Cards is on average approximately $225,000 on a monthly basis, and as of the Petition Date, the Debtors estimate that they have approximately $1.4 million of value in Gift Cards issued and outstanding.[5]  The Debtors do not maintain a cash reserve account to fund outstanding Gift Cards.  Unless required by applicable state law, the Debtors do not permit the redemption of Gift Cards for cash.[6]  Additionally, the Debtors issue Gift Cards to customers for merchandise returns and/or exchanges.  The Gift Cards issued for such returns are, in essence, store credit.  The Gift Cards and merchandise credits issued by the Debtors are handled by a third party service provider.  The Debtors request authority to honor all Gift Cards in the ordinary course of their business.

136.   <u>Refunds and Exchanges</u>.  In the ordinary course of their businesses, the Debtors honor refunds and exchanges of merchandise purchased at their retail locations.  Specifically, customers returning merchandise purchased at any of the Debtors' retail locations within thirty (30) days of its purchase may receive a full refund or exchange for a comparable product so long as the return is accompanied by a copy of the customer's original receipt.

---

[5] The estimate for outstanding Gift Cards does not include the amount of Gift Cards issued prior to 2010.  The Debtors are seeking to honor all such Gift Cards but, based upon historic redemption rates, do not expect that the redemption amount for pre-2010 Gift Cards will be material.

[6] For example, in California, the Debtors are required by applicable state law to redeem any balance on a Gift Card of $10.00 or less for cash upon customer demand.

Without a receipt, the merchandise is refunded at the lowest selling price in the form of a Gift Card or exchange. Approximately $2 million of merchandise, on average, is returned on a monthly basis. The Debtors request authority to continue their ordinary course practices relating to refunds and exchanges.

137.    <u>Discounts and Coupons</u>.  In the ordinary course of their businesses, the Debtors offer various coupons and discounts which are marketed in a variety of ways. The Debtors offer all of their associates, their spouses, parents, in-laws and children 30% off full price merchandise purchased for their own personal use or as gifts (excluding gift cards and service fees). Each month, the Debtors also offer their associates 40% off their full price merchandise purchased for their own personal use (excluding gift cards and service fees). Also, the Debtors periodically offer coupons and discounts to the public which are marketed in a variety of ways. The Debtors use a variety of promotional strategies that vary depending on many factors. Once per month, the Debtors typically offer 20% to 30% off of an entire purchase for a four-day period. Quarterly, the Debtors offer a friends and family discount of 30% off of an entire purchase. Through the end of March, the Debtors are offering discounts ranging from 20-40% based on dollars spent and coupons distributed through both physical and electronic media. In April, the Debtors are planning on offering (i) 25% off of one regular priced item to certain Ashley Stewart Credit Card holders as well as certain non-card holders for a special yearly sale, (ii) $25 off of a purchase of $75 or more and (iii) various Easter Day promotions. In April, the Debtors also plan to begin a "Diva Dollars" Program. Distribution with respect to the Diva Dollars Program is scheduled to begin on April 17, 2014. Starting on this date and continuing through June 2, 2014, customers who spend at least $40 will receive a $20 coupon to be used towards any purchase of $40 or more made from June 6, 2014 to June 10, 2014.

138.   <u>Credit Card Program</u>. As part of their efforts to build customer, store and brand loyalty, the Debtors participate in a private label credit card program offered to qualifying customers.  Through the private label credit card, card holders are entitled to, 20% off if the customer is approved on the spot and uses the credit card for the first time, a welcome kit with coupons, as well as other coupons during birthday months, and other offers.  The private label credit cards provide the Debtors' customers with financing for the purchase of goods at the Debtors' stores and online.  Under this program, the Debtors pay a third party credit card program administrator, Alliance Data Systems ("<u>ADS</u>") certain costs related to a low score credit program and seek authority to honor any outstanding prepetition obligations to ADS in relation thereto.  On occasion, users of the Debtors' private label credit cards pay their monthly bills at the Debtors' stores via cash or check.  The Debtors then remit those receipts to ADS.

139.   From a customer service perspective, the private label credit card program is administered by ADS.  ADS provides management and ad hoc reporting to the Debtors in connection with the private label credit card and marketing efforts.  The Debtors work with ADS on marketing materials, coupons and other items for distribution to cardholders.  In connection with the marketing process, the Debtors are responsible for a certain level of marketing cost under the credit card plan agreement with ADS.  The Debtors estimate that during the calendar year ended December 31, 2013, approximately $40 million worth of goods were purchased by customers using the Debtors' private label credit card.

140.   <u>Layaway</u>. The Debtors offer their customers a layaway program for purchasing merchandise (the "<u>Layaway Program</u>").  Customers are required to put down a minimum deposit of 25% of the layaway purchase price or $25 (whichever is greater) as a prepayment for merchandise the customers wish to layaway.  The merchandise is put on hold for

fourteen (14) days.  There is a $3 fee to put merchandise on layaway, and an $8 cancellation fee

if the merchandise is not picked up within the fourteen (14) days.  If cancelled, a gift card is

issued for all amounts paid minus the fees.  Customers may receive a one-time price adjustment

without incurring a cancelation fee.  As of the Petition Date, the Debtors have approximately

$80,000 in customer deposits under the Layaway Program.  These claims are satisfied in the

ordinary course by delivery of goods ordered by the customer upon the Debtors' receipt of the

balance of the purchase price. The vast majority of deposits represent only a fraction of the

purchase price of the layaway goods.

        141.     Contests/Loyalty Programs. The Debtors also frequently run contests

through various mediums including on mobile devices and electronic mail (the "Contests").  In

addition, the Debtors implement various customer loyalty programs designed at enhancing store

loyalty among the Debtors' existing customer base.  The Debtors request authority to honor the

Contest promotions in the ordinary course of business and to implement such other and further

programs as needed.

        142.     Other Customer Programs. The Debtors also engage in various Customer

Programs for which the Debtors believe there are no outstanding prepetition obligations.  In the

ordinary course of business, the Debtors offer various coupons and discounts to the public, as

well as certain discounts to their employees.  The Debtors also participate from time to time in

"daily deal" coupon offerings through third party websites, and engage in other customer

directed programs.

        143.     I believe that the continued loyalty of the Debtors' existing customers and

the Debtors' ability to attract new customer is critical to their continued operations and the

success of the Chapter 11 Cases.  If the Debtors are prohibited from honoring and maintaining

the Customer Programs consistent with their past business practices, then customers' lost confidence in the Debtors will damage the Debtors' business to an extent that far exceeds the cost associated with honoring and continuing such practices.  At this critical time, the Debtors cannot afford to lose the loyalty of their customers or to be placed at a competitive disadvantage with respect to prospective customers and the ability to engage in a going concern sale transaction.

144.    I also believe that immediate entry of an order approving the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates. As mentioned above, the success and viability of the Debtors' businesses are dependent upon the loyalty and confidence of their consumers.  The continued support of the customers is essential to the survival of the Debtors' businesses and the Debtors' ability to facilitate an orderly sale of their assets for the benefit of all their stakeholders.  Any delay in honoring various Customer Programs or discontinuation of Customer Programs as a result of the commencement of these Chapter 11 Cases will severely and irreparably impair the Debtors' customer relations at a time when the loyalty and support of those customers are needed most.

145.    By contrast, honoring these prepetition obligations will likely require minimal expenditure of estate funds and will assist the Debtors in preserving customer relationships for the benefit of all stakeholders.  The Debtors anticipate that any cost of continuation of the Customer Programs will be satisfied primarily (if not exclusively) by the Customers' continued purchases of the Debtors' products, rather than by payment of cash from the Debtors' estates.  Accordingly, to preserve the value of their estates, the Debtors must be permitted, in the Debtors' reasonable business judgment, to continue honoring the Customer Programs without interruption or modification.  In addition, to provide necessary assurances to

17585522

the Debtors' customers on a go-forward basis, the Debtors request authority to continue honoring

or paying all obligations to customers, whether such obligations arise prior to or after the Petition

Date in the ordinary course of the Debtors' businesses.

146.    I believe that the Debtors' creditors also will benefit from the relief

requested.  If the Debtors are prohibited from maintaining policies consistent with past business

practice, then customers' lost confidence in the Debtors will damage the Debtors' business to an

extent that far exceeds any cost associated with continuing such practices.  An order authorizing

the relief will protect the Debtors' reputation during this critical time and enhance the Debtors'

ability to generate revenue and thus further the goals of a going concern sales transaction.

147.    Based on the foregoing, the Debtors submit that the relief requested is

necessary and appropriate to avoid immediate and irreparable harm to the Debtors, and is in the

best interest of their estates and creditors.

**N.**     ***Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to
(A) Conduct Store Closing Sales at Certain Locations; (B) Enter Into and
Approving the Consulting Agreement with Gordon Brothers Retail Partners
LLC; and (C) Reject Certain Unexpired Leases of Nonresidential Real Property***

148.    The Debtors seek authorization to conduct store closing sales at certain

locations, enter into the Consulting Agreement with Gordon Brothers Retails Partners, LLC

("GBRP") and reject certain unexpired leases of nonresidential real property.  Pursuant to the

Consulting Agreement, GBRP will act as the Debtors' consultant with respect to conducting

Store Closing Sales at 27 retail store locations (the "Closing Stores") through March 31, 2014

(the "Rejection Date").  GBRP has agreed to a reduced consulting fee in connection with efforts

in connection with the Store Closing Sales.  The expenses of the Store Closing Sales

17585522

(approximately $53,000) were pre-funded to GBRP from the Debtors (the "Expenses Advance").

The Expenses Advance is used solely for advertising and supervision of the Store Closing Sales.[7]

    149. On the Rejection Date, the leases with respect to the Closing Stores will be

deemed rejected.

### The Consulting Agreement

    150. On March 6, 2014, GBRP and the Debtors entered into the Consulting

Agreement.  Pursuant to the terms of the Consulting Agreement, GBRP will act as a consultant

to the Debtors with respect to conducting the Store Closing Sales at the Closing Stores.  GBRP

will earn a fee under the Consulting Agreement equal to 1.25% of gross proceeds of all sales

(including without limitation cash, credit card and gift card proceeds) of the Debtors' goods at

each Closing Store.  The expenses of the Store Closing Sales (approximately $53,000) were pre-

funded to GBRP from the Debtors (the "Expenses Advance").  The Expenses Advance is has

been and/or will be solely for advertising and out of pocket costs related to supervision of the

Store Closing Sales.  It is anticipated that the fee due to GBRP under the Consulting Agreement

will range from approximately $15,000 to $18,000.  The average inventory per store ranges from

approximately $35,000 to $40,000.  The total cost value of the inventory in the Closing Stores

ranges from approximately $945,000 to $1,080,000, translating to a range at retail value of

approximately $1,200,000 to $1,300,000.  Gift cards and merchandise credits issued by the

Debtors prior to the Petition Date will be accepted and honored by as provided in the Consulting

Agreement.

---

[7] The Debtors will be filing the *Declaration of Perry M. Mandarino in Support of the Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Conduct Store Closing Sales at Certain Locations; (B) Enter Into and Approving the Consulting Agreement with Gordon Brothers Retail Partners LLC; and (C) Reject Certain Unexpired Leases of Nonresidential Real Property* contemporaneously herewith.  Additionally, it is the Debtors' understanding that GBRP will also be filing a declaration related to, among other things, entry into the Consulting Agreement.

151.    In the sound exercise of business judgment, the Debtors decided to enter into the Consulting Agreement with GBRP because of GBRP's excellent reputation as a retail liquidator.  The entry into the Consulting Agreement was approved by the Board of Directors of Holdings, including the independent member, Alan B. Miller.[8]  Indeed, on two occasions prior to the Petition Date, GBRP was similarly employed as a consultant to Ashley Stewart. Additionally, recognizing the Debtors' liquidity constraints, GBRP has agreed to perform under the Consulting Agreement at a below-market rate which I believe is extremely beneficial to the Debtors and their estates.

152.    GBRP will provide a weekly notice to the Debtors, the United States Trustee, Salus Capital Partners LLC and any statutory committee appointed in the Chapter 11 Cases disclosing the gross proceeds of the Store Closing Sales.

153.    Delay in commencing the Store Closing Sales would diminish value for several important reasons.  First, the Closing Stores currently do not generate profits and are a drain on liquidity.  The sooner the assets at the Closing Stores are liquidated (and the Closing Stores' leases are rejected), the sooner the strain on the Debtors' liquidity will be mitigated. Second, the Debtors have not replenished the inventory at the Closing Sales as they have focused allocation of new inventory to profitable locations.  Third, the Closing Stores would not be desired by any potential purchasers of the Debtors' assets with whom we have had discussions. Therefore, there is no enterprise value associated with these stores.  Thus, it is my opinion that the Store Closing Sales are in the best interests of the Debtors and their estates.

154.    The Debtors, with the assistance of their advisors, have determined to close the Closing Stores by means of the Store Closing Sales as set forth in the Consulting

---

[8] A declaration in support of the Debtors' entry into the Consulting Agreement is being filed contemporaneously herewith.

17585522

Agreement and pursuant to the Sale Guidelines, begin liquidating the merchandise at the Closing

Stores.  I believe that time is of the essence to preserve and maximize the value of the Debtors'

assets before the merchandise significantly declines in value, and to reduce on-going

administrative expenses.  Each of the Closing Stores contains significant levels of merchandise

that will be included in the Store Closing Sales.  The realization of fair value for these assets as

promptly as possible will inure to the benefit of all parties in interest.

155.    The Debtors also seek a waiver of compliance with any state and local

laws, statutes, rules and ordinances restricting the Store Closing Sales.  In the instant cases, state

and local licensing requirements, time limits or other restrictions on liquidation sales would place

constraints on the Debtors' ability to marshal and maximize estate assets for the benefit of

creditors.

156.    It is also necessary that any action by any lessor or any federal, state or

local agency, department or governmental authority or any other entity to prevent, interfere with

or otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be

enjoined.

157.    Additionally, the Debtors request that they be authorized to reject the

leases of the Closing Stores (the "Initial Rejected Leases"), effective as of the earlier of

(i) March 31, 2014 and (ii) the date the property is actually abandoned by the Debtors.  I have

determined, in the exercise of my business judgment, that the Initial Rejected Leases are a

burden to these estates and should be rejected immediately.

158.    The decision to reject the Initial Rejected Leases was made based upon the

Debtors' operational needs as they wind-down operations at certain of their less profitable

locations.  Given the limited liquidity available to the Debtors, there is no need for the Initial

17585522

Rejected Leases, which lack value to the Debtors' estates. I believe that, due to Debtors' financial condition and the need to immediately reduce unnecessary administrative claims against their estates, the equities under the circumstances weigh in favor of permitting the Debtors to reject expeditiously the Initial Rejected Leases. Accordingly, rejection of these Contracts and Leases should be approved.

159. Additionally, the Debtors' request the authority to abandon certain personal property related to Initial Rejected Leases (the "Related Property"), which primarily consist of office materials and obsolete fixtures or equipment that are (i) of no value or benefit to the Debtors' estates and/or (ii) burdensome insofar as the costs of removal.

160. Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate to avoid immediate and irreparable harm, and is in the best interest of their estates and creditors.

**O.** ***Motion of Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 (I) Approving Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Granting Related Relief, and (VII) Scheduling a Final Hearing***

161. The Debtors seek authorization to obtain DIP Financing on a senior secured and superpriority basis in accordance with the terms of the DIP Credit Agreement, use Cash Collateral, grant adequate protection to the Prepetition Secured Parties with respect to the use of such Cash Collateral, as well as approval of the form and manner of notice of and setting the time for the Final Hearing and other certain related relief.

162. In the ordinary course of business, the Debtors use cash on hand and cash generated by their operations to fund working capital, inventory purchases, and capital expenditures and for other general corporate purposes. An inability to access and use cash in the

ordinary course of business during the Chapter 11 Cases could cripple the Debtors' business. Indeed, the Debtors must use their cash to, among other things, continue to operate their business in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and satisfy other working capital and operation needs, all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful sale of some or all of the Debtors' businesses. Access to the DIP Facility and use of Cash Collateral will allow the Debtors to continue operating their business while working to right-size their store footprint and pursue a sale of some or all of its businesses. After pursuing other avenues for funding their continuing operations, the Debtors have determined that the DIP Facility is the best financing option available to them.

163.    Leading up to the Petition Date, the Debtors worked with their advisors to formulate a plan that would provide the Debtors with sufficient liquidity to continue their operations. The Debtors, however, have been unable to devise such a plan and, as of the Petition Date, anticipate lacking sufficient liquidity to continue operating their businesses without the DIP Facility. Accordingly, without access to the DIP Facility, the Debtors would be required to commence an immediate shutdown of their operations and piecemeal liquidation of their assets to the detriment of their creditors, vendors, employees, and other stakeholders.

164.    The DIP Facility will provide the Debtors the liquidity that they need to continue to operate through a plan of reorganization or sale process. The amount that Salus is willing to lend is based in significant part on the "appraisal percentage" that applies to the cost value of the Debtors' inventory; if that percentage increases, the Debtors' liquidity increases. As part of the DIP Facility, Salus has agreed to increase the appraisal percentage to 95% from a prepetition level of 92%, which will generate significant increased liquidity to fund the Debtors'

operations and these Chapter 11 Cases.  Providing the Debtors with the ability to continue their operations through a going concern sale with a competitive bidding process, rather than a piecemeal liquidation, will maximize value for the Debtors' creditors, vendors, employees, and other stakeholders.  Most significantly, the ability to pursue a going concern sale will provide the Debtors with an opportunity to preserve the jobs of a significant amount of their employees.

165.    The Debtors' execution of the DIP Documents is an exercise of their sound business judgment.  Accordingly, the Debtors began negotiating with the Prepetition Senior Secured Parties regarding the terms of a postpetition DIP facility.  After a series of good faith, arms'-length negotiations, the Debtors and the DIP Secured Parties entered into the DIP Credit Agreement, thereby reaching agreement on the material terms of the DIP Facility (subject to the DIP Financing Conditions).  Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative.

166.    The Debtors and their advisors have canvassed the market to find interested parties to participate in the debtors-in-possession financing and their advisors have assisted the Debtors in negotiations to obtain the best terms available.  However, for a number of reasons, including but not limited to the existence of liens granted to the Prepetition Senior Secured Parties and the Prepetition Junior Secured Parties, none of the institutions contacted were willing or available to provide financing to the Debtors in the time frame required to address the Debtors' urgent liquidity needs.  Moreover, as noted, virtually all of the Debtors' assets are encumbered by Prepetition Liens.  Thus, even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in the

time required to address the Debtors' immediate liquidity needs, such a financing would result in a protracted priming contest with the Prepetition Secured Parties, the results of which could not be predicted with certainty. Such potential protracted litigation would jeopardize the Chapter 11 Cases from the outset. By contrast, under the proposed DIP Facility, the DIP Agent will be granted priming liens pursuant to the terms of the DIP Orders, but the DIP Agent will be priming itself on a fully consensual basis and the Prepetition Junior Secured Parties in accordance with their rights under the Prepetition Subordination Agreement.

167.    The Debtors' and their advisors' discussions with various potential sources of debtor-in-possession financing revealed that such financing on a junior or unsecured basis was not available.

168.    Therefore, pursuant to the terms of the DIP Credit Agreement, the DIP Facility will provide the Debtors with funds which the Debtors and their advisors have determined should be sufficient to solidify their credit-worthiness to their vendors and support the Debtors' ongoing operations during the Chapter 11 Cases.

169.    The Debtors are unable to obtain credit sufficient to sustain their day-to-day business operations or to maintain the going concern value of their assets other than by the granting to the DIP Agent a first priority lien and security interest in the Debtors' assets as provided in the Interim DIP Order. Moreover, the Debtors negotiated the DIP Credit Agreement at arms'-length and have determined, in the exercise of their business judgment and in consultation with their professional advisors, that such financing is the best and only viable financing available under the circumstances.

170.    The Debtors have been informed that the Prepetition Secured Parties support and consent to the proposed DIP Facility in its entirety. Moreover, the Prepetition Junior

Secured Parties have already consented (or are deemed to consent) to the proposed financing and cash collateral arrangements pursuant to the terms of the Prepetition Subordination Agreement.

171.    Thus, for all of the reasons set forth above, I believe that the circumstances of these Chapter 11 Cases require the Debtors to obtain financing.  The Debtors further submit that the terms of the DIP Facility and the DIP Orders are fair, reasonable, and necessary under the circumstances, and should be approved in their entirety.

172.    As discussed above and as set forth in detail in the Interim DIP Order, the Debtors propose to provide the Prepetition Secured Parties, with three primary forms of adequate protection to the extent of any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral) resulting from the Debtors' use, sale, or lease of the Prepetition Collateral (including the Cash Collateral) during the Chapter 11 Case and the imposition of the automatic stay.

173.    First, the Debtors will provide the Prepetition Secured Parties with adequate protection replacement liens in all Prepetition Collateral (subject to certain Permitted Liens and the Carve-Out), which includes, without limitation, any and all property of the Debtors, to the extent of and diminution in the value of the Prepetition Collateral.  Second, (subject to certain Permitted Liens and the Carve-Out), as further protection against any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral, the Prepetition Secured Parties shall be granted the superpriority claims against the Debtors.  Third, the Debtors will provide the Prepetition Secured Parties with payment of reasonable professional fees and expenses, subject to the limitations set forth in the DIP Documents and Budget.

174.    In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties agree, that the foregoing forms of proposed adequate protection for the benefit of the Prepetition Secured Parties are necessary and appropriate under the circumstances of the Chapter 11 Cases to ensure that the Debtors are able to continue using Cash Collateral.  Accordingly, the proposed adequate protection which is in the DIP Orders is fair and reasonable.

175.    Finally, it is my understanding that repayment of the debt owed to the Prepetition Secured Parties (but only upon entry of the Final DIP Order) will not prejudice other creditors because the Interim DIP Order provides that the approval of the DIP Facility is without prejudice to the right of any official committee appointed in the Chapter 11 Cases (or, if none, parties in interest) to contest or challenge the validity of the Prepetition Senior Secured Parties' liens.  For the foregoing reasons, the Debtors respectfully submit that the repayment of the Prepetition Senior Secured Obligations is appropriate in light of the circumstances of the Chapter 11 Cases.

176.    The proposed DIP Facility subjects the security interests granted to the DIP Lenders to the Carve-Out.  Such carve-outs for fees to be paid to professionals in these Chapter 11 Cases are reasonable and necessary to ensure that the Debtors' estate and any statutory committee can retain counsel.  The inclusion of the Carve-Out in the DIP Credit Agreement or the DIP Orders do not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the service for which professional may be paid in these Chapter 11 Cases.  Additionally, it is my understanding that the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that adequate assets remain for the payment of fees to the United States Trustee fees and the Clerk of the Court.

177.    The Interim DIP Order defines the DIP Collateral as including all causes of action or proceeds thereof, including avoidance actions, upon entry of the Final DIP Order. Here, the DIP Agent and the DIP Lenders required the granting of such liens as a necessary condition to extending financing under the DIP Credit Agreement.  The Debtors require the financing under the DIP Facility to avoid a near-term "fire-sale" liquidation of their assets and accordingly, the Debtors submit that it is appropriate to grant the DIP Agent and the DIP Lenders liens on avoidance actions.

178.    Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate to avoid immediate and irreparable harm, and is in the best interest of their estates and creditors.

*[Remainder of page left intentionally blank.]*

17585522

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Dated: March 10, 2014
      Secaucus, NJ

                                  _____
                                  Michael A. Abate

**Exhibit A**

# NEW ASHLEY STEWART
## Corporate Structure & Debt – March 2014



---

¹ **$5.0 Million Second Lien Senior Notes due 2017 and $10.0 Million Third Lien Senior Notes due 2017 are guaranteed by, and secured by all of the assets of, New Ashley Stewart, Inc., AS IP Holdings, Inc. and NAS Gift LLC**

² **$20.0 Million First Lien Revolving Loan is guaranteed by Ashley Stewart Holdings, Inc., AS IP Holdings, Inc. and NAS Gift LLC, and secured by all of the assets of those three companies and the assets of New Ashley Stewart, Inc.**

17585522